656 F.2d 120
 26 Fair Empl.Prac.Cas. 1381,
27 Empl. Prac. Dec. P 32,126
James L. WILLIAMS, Jr., L. C. Allen, Roy B. Davison, Jacob
C. Johnson, William W. Landers, William N. Bailey,
Ralph Dodd, William J. Bales, et al.,
Plaintiffs-Appellants, Cross-Appellees.
v.
GENERAL MOTORS CORPORATION, Defendant-Appellee, Cross-Appellant.
 Nos. 79-2857, 80-7192.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 Sept. 14, 1981.
 Charles E. Moore, Atlanta, Ga., Bruce D. Duncan, Doraville, Ga., for plaintiffs-appellants, cross-appellees in both cases.
 Otis Smith, General Motors Corp., J. R. Wheatley, Detroit, Mich., for defendant-appellee, cross-appellant in 79-2857.
 
 
 1
 Charles H. Kirbo, William A. Clineburg, Jr., L. Joseph Loveland, Atlanta, Ga., for defendant-appellee, cross-appellant in both cases.
 
 
 2
 King & Spalding, Atlanta, Ga., for defendant-appellee, cross-appellant in 80-7192.
 
 
 3
 Appeals from the United States District Court for the Northern District of Georgia.
 
 
 4
 Before GODBOLD, Chief Judge, and HILL, Circuit Judge, and SHOOB,* District Judge.
 
 JAMES C. HILL, Circuit Judge:
 
 5
 In this case, we explore the contours of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634 (1976 & U.S.C.A.Cum.Supp.1980), and resolve questions concerning the intended scope of that Act. Our conclusion, in brief, is that plaintiffs have failed to establish a prima facie case of age discrimination, and we accordingly affirm certain orders of the district court and reverse others, as detailed infra.
 
 
 6
 The trial of this cause was tortuously complex; the many thousands of pages of trial testimony, depositions, and exhibits bear witness to that. The record reveals a most patient and thorough trial judge whose detailed inquiries and reasoned orders at all stages of this cause have facilitated greatly our own decisional process. To the facts and factors of that process, we now direct our attention.I. BACKGROUND
 
 A. Factual Overview and Procedural History
 
 7
 In January 1975, plaintiffs[1] were employed by the General Motors Corporation (GM) in salaried, supervisory positions at two Atlanta-area plants, one located on Lakewood Avenue in the city, the other located in Doraville, Georgia. At about this time GM in an effort to cope with the deepening economic recession introduced at both plants a series of "personal adjustments" which affected all plaintiffs and precipitated this lawsuit. The "adjustments," which entailed elimination of one of two shifts in operation at each plant, left three plaintiffs[2] jobless and relegated the others to hourly wage employee status.[3] The effect of this action on the size of the salaried supervisory staff at the two plants was profound: personnel was cut approximately 50 percent; a total of 397 salaried employees were either reduced to hourly wage status or laid off.
 
 
 8
 On May 30, 1975, fifteen of the plaintiffs in this case filed a voluminous complaint charging unlawful age discrimination by defendant General Motors, seeking damages, attorneys' fees, back pay, and injunctive relief. The complaint, which was subsequently amended to embrace four additional party-plaintiffs, was brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 (1976), and was grounded jurisdictionally upon 29 U.S.C. § 633a(c) (1976). The operative allegations of plaintiffs' complaint, which appeared in paragraphs 11, 12, and 13 of each of the counts, charged:
 
 11.
 
 9
 The action taken by defendant in altering plaintiff's job position was based upon said employee's age.
 
 12.
 
 10
 The mentioned change in plaintiff's job position from a salaried position was made by defendant, while defendant retained employees younger than plaintiff and with less seniority than plaintiff in salaried positions which plaintiff was capable of fulfilling as adequately as, if not better than, said retained younger employees.
 
 13.
 
 11
 The above mentioned activity of defendant in changing plaintiff's job position was part of a general scheme of defendant to either lay off or demote from salaried positions to hourly wage positions employees of defendant whose age was forty (40) years or greater but less than sixty-five (65) years.
 
 
 12
 Plaintiffs' Complaints, Record, Vol. I, at 3091, 3094. A jury trial of plaintiffs' legal claims commenced on February 22, 1979, and lasted three weeks. At the very outset, plaintiffs called six GM "managing agents" to testify, on cross-examination, as to certain of defendant's internal procedures. The district court denied GM's request to question these witnesses at that time since GM would later, in presenting its own case, have opportunity to call its own agents to testify.
 
 
 13
 Plaintiffs' theory, propounded at trial, is that GM embraced two discriminatory policies in effecting its job reductions. The first of these was GM's secret computerized rating systems maintained for salaried employees. The ratings stored on this system were not available to a subject employee and differed from the official personnel ratings also kept on an employee. The numerical composite rating score crucial to this system reflected three factors: potential, or long-range ability to advance; promotability, or the immediacy with which an employee could advance; and, job performance, or ability to perform assigned duties. Plaintiffs' statistical expert, Frank Millard, testified that he examined relevant rating figures for the two GM plants in question, constructed an age classification statistical system consisting of nine intervals covering employee ages 21 to 63, determined a mean age for each classification, and undertook regression and Chi-square analyses to determine the relationship, if any, between age and one of the three rating factors, "potential." The expert's conclusion was "that as a person's age increased their (sic) potential rating became worse." Record, No. 79-2857, Vol. XV, at 2230. On cross-examination, however, plaintiffs' expert's testimony was subjected to careful scrutiny. Millard first admitted that, in the personnel actions under investigation, an older GM employee had a greater likelihood of retention during the reduction than a younger employee. He then acknowledged that he found no relationship between an employee's "potential" rating and how that employee fared during the reduction. Finally, GM's counsel asked plaintiffs' expert to address the other two factors in the composite personnel score, "job performance" and "promotability."
 
 
 14
 Q. ... (Y)ou made a study of that, didn't you?
 
 
 15
 A. Yes.
 
 
 16
 Q. And you determined from that study that there was no correlation between someone's promotability rating and his age, did you not?
 
 
 17
 A. Yes.
 
 
 18
 Q. And you also determined that there was no correlation between someone's job performance rating and his age, did you not?
 
 
 19
 A. That's correct.
 
 
 20
 Id. at 2259.
 
 
 21
 The second GM policy theorized to constitute unlawful age discrimination was the insulation of recent college graduates and graduates of the General Motors Institute from job reductions. This policy was evidenced by two documents the so-called "Fuller letters" written by Stephen Fuller, GM's vice-president of personnel administration and development staff.
 
 
 22
 Employee transfer schemes were used in tandem with both the secret rating system and the insulation of recent graduates, plaintiffs allege. To prevent a younger employee's reduction, GM would rotate him either within or between departments, depending upon the situation at hand. If slots were unavailable, younger employees alternatively would be placed in the personnel department or on training budgets, often only to be returned to manufacturing and service departments at a future time.
 
 
 23
 At the close of plaintiffs' case, GM moved the court to direct a verdict against fifteen[4] plaintiffs. The motion addressed two alleged shortcomings in the cases of the relevant plaintiffs: failure by plaintiffs Collins and Johnson to establish any monetary loss resulting from their respective job reductions, and failure by all fifteen of the plaintiffs embraced by the motion to offer proof that they were replaced by persons outside the age group protected by the ADEA.[5] The district court granted the motion as to plaintiffs Collins and Johnson[6] but declined to rule on GM's broadside attack on the evidence presented by the other plaintiffs. The district court indicated it would take the latter motion under advisement and would reconsider it on motion for judgment non obstante veredicto or new trial, should the outcome of the trial necessitate such motions.
 
 
 24
 As the lengthy and complicated trial neared conclusion, the parties stipulated as to each individual plaintiff, amounts disbursed by GM in layoff or reduction benefits, vacation pay, and unemployment benefits.[7] While the jury clearly was instructed that it was permitted to deduct from a plaintiff's back pay award amounts actually received in unemployment benefits, the jury was not instructed on the handling of "vacation pay" in the damages calculus. In fact, plaintiffs attempted to admit the testimony of Dick Wintersteen, who was prepared to testify inter alia that vacation pay is actually "earned" by an employee in the year preceding its grant. The trial court, however, refused to permit this testimony.
 
 
 25
 Following trial of the issues, the jury returned a verdict awarding back pay and liquidated damages to all seventeen remaining plaintiffs. GM moved for new trial or judgment N. O. V. The district court on June 19, 1979 entered judgment denying the motion for new trial but granting in part the J. N. O. V. motion by ordering amounts received as vacation pay by each successful plaintiff deducted from his award of back pay and liquidated damages. Because ten of the plaintiffs had accrued vacation time that translated into monetary payments in excess of their back pay awards, the district court's partial grant of the J. N. O. V. motion stripped those ten of their jury awards. At this point, two important issues still remained for the district court's consideration: injunctive relief and attorneys' fees. The district court held hearings on these issues respectively, on July 18 and November 1, 1979.
 
 
 26
 At the July 18, 1979 hearing, the question before the district court was whether to grant plaintiffs' request for a permanent injunction against GM. Rather than introduce new evidence, plaintiffs relied on all evidence actually admitted in the earlier jury trial, which, of course, principally dealt with discriminatory events alleged to have occurred in 1974 and 1975. At this hearing, GM, however, did successfully introduce over plaintiffs' objections a 1977 edition of its booklet "Working with General Motors." The booklet had been excluded at the jury trial when proffered by plaintiffs in light of GM's relevancy objections: the 1977 policy manual had nothing to do with the 1975 job reductions at issue before the jury. GM also produced at this hearing a witness, Robert P. Surowiec, the Doraville plant's personnel director. Surowiec explained that the 1977 booklet, "Working with General Motors," outlined the official GM employee appraisal process and work-reduction policies applicable to salaried employees. This new policy led the district court to conclude that the alleged discriminatory approach taken by the "Fuller letters" was no longer in force. Accordingly, on September 5, 1979, the prayer was denied.
 
 
 27
 Later that month, on September 28, plaintiffs moved for an award of $126,640.00 in attorneys' fees, attaching to their motion an itemized list of attorney and paralegal hours spent on the case. Attorney time alone exceeded 1800 "billable" hours. In advance of the November 1, 1979 hearing on this issue, plaintiffs served a subpoena duces tecum upon GM and its counsel, King & Spalding, requiring production of the defense bill for representation in this litigation. GM's motion to quash was granted by the district court at the outset of the hearing. At the attorneys' fees hearing, the district court expressed some reservations about the itemized bill and stated that its admission was "provisional." The difficulty with the bill lay in its method of preparation. One of plaintiffs' attorneys, Bruce P. Duncan, testified that handwritten notations of time spent on the case were kept in a folder for about four years until January 1979, when the contents of the notations were dictated to a secretary who typed the data into an automatic "memory" typewriter. Not a single original handwritten notation survived this automized procedure. The district court, by order of February 8, 1980, declared plaintiffs were entitled to an attorneys' fee award of $14,669.85 in keeping with the original representation contract to which plaintiffs and their counsel had agreed.[8] From the judgment of February 11, plaintiffs have appealed to this Court.
 
 II. Jurisdictional Matters
 
 28
 GM has directed the Court's attention to a potential jurisdictional defect in the appeals of two plaintiffs, Collins and Johnson. Cf. note 6 supra. Verdicts were directed against these two plaintiffs and judgments entered against them on March 16, 1979.
 
 
 29
 Collins, without Fed.R.Civ.P. 54(b) certification,[9] filed an appeal to this Court on April 4, 1979. Although we dismissed the appeal on July 17, the district court had on June 19 entered partial judgments N. O. V. on the successful claims of the other plaintiffs. In response to the June 19 entry, plaintiffs other than Collins and Johnson noticed appeal (Docket No. 79-2857) on July 6. Probably because Collins' appeal, as of July 6, had not yet been dismissed by our Court, he did not join in the notice filed that day.
 
 
 30
 As a result of that failure, GM argues that we are without jurisdiction to consider points raised by either Collins or Johnson. "Plaintiff Johnson," GM states in brief, "did not file a Notice of Appeal." Following dismissal of Collins' appeal, GM asserts he "did not file a subsequent notice." These statements are inaccurate. Both Collins' and Johnson's names appear on the notice of appeal filed with this Court on February 20, 1980. See Record, No. 80-7192, at 103. Because all prior orders of the district court were "subject to revision," see Fed.R.Civ.P. 54(b), i. e., interlocutory, Collins and Johnson preserved their appeals through that notice.
 
 
 31
 Two aspects of this notice of appeal still, however, warrant some attention. First, the appeal represented by the February 20 notice is separately docketed No. 80-7192. While this suggests a distinction between its subject matter and the subject matter of No. 79-2857, the two appeals merely represent different stages of the same district court case. Moreover, the assignment of a docket number to an appeal is a ministerial, reflexive act performed by the Clerk "(u)pon receipt of the copy of the notice of appeal and of the docket entries," Fed.R.App.P. 12(a); it does not affect federal appellate jurisdiction. Second, the notice refers to judgment "entered on February 11, 1980, said Judgment appearing to have been the Final Judgment in the case" as the subject matter of the appeal. The quoted language, taken together with the requirement of Fed.R.App.P. 3(c) that the notice of appeal "designate the judgment, order or part thereof appealed from," might suggest that the notice applies exclusively to the February 11, 1980 judgment. This interpretation would, of course, limit Collins' and Johnson's appeals to the February 11, 1980 order, which dealt only with attorneys' fees. But our precedents exact a contrary interpretation under the facts at hand. In Blitzstein v. Ford Motor Company, 288 F.2d 738 (5th Cir. 1961), we held, in determining whether a party complied with the almost identical language of Rule 3(c)'s predecessor, Fed.R.Civ.P. 73(b), that the Court "may look to 'the statement of points and designation of contents of record on appeal,' " 288 F.2d at 740 (citations omitted). Our study leads us to the conclusion that the February 20 notice of appeal is all-embracing as to issues and parties.[10]
 
 III. GM's Cross-Appeal
 
 32
 GM, on cross-appeal, has leveled a penetrating attack upon the district court's conception of a prima facie showing under the ADEA and the facts of this case. The incisive nature of GM's argument logically compels us to hold plaintiffs' appeal at bay while we consider GM's assertions. The argument has three components; each applies to a different albeit overlapping subset of the nineteen plaintiffs. First, GM charges the district court with error in failing to require each plaintiff to demonstrate that he was replaced by an individual outside the "protected age group." Second, GM argues that each plaintiff should have been required either to show that he was considered for a job later filled by a younger person, or that GM "consciously refused" to consider him for jobs for which he qualified. Third, GM claims that the "cumulative effect" of the alleged incidents of district court error "produced substantial prejudice" to GM and requires reversal. With this outline of GM's argument at hand, we now turn for illumination to the purposes of the ADEA and to the legal precedents developed thereunder.
 
 A. Statutory History
 
 33
 In a special message to Congress on January 23, 1967, President Johnson urged enactment of a law that would eliminate what he regarded as "a serious and senseless loss to a nation on the move." 1 Public Papers of the Presidents of the United States: Lyndon B. Johnson, at 37 (1968). His target was well-defined: "arbitrary age discrimination." Id. at 32. Two years earlier the Labor Department had studied problems associated with aging and had estimated their effect, namely, to bar entry attempts by 50 percent of all applicants to the private job market. Id. at 37. See H.R.Rep.No.805, 90th Cong., 1st Sess. reprinted in (1967) U.S.Code Cong. & Admin.News 2213, 2214.
 
 
 34
 Congress reacted swiftly to the President's message. It considered the Labor Department's study, the experiences of 24 states that already had enacted age discrimination legislation, and the testimony of witnesses, see Age Discrimination in Employment: Hearings on Age Discrimination Bills Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 90th Cong., 1st Sess. (1967); Age Discrimination in Employment: Hearings on Age Discrimination Bills Before the Gen. Subcomm. on Labor of the House Comm. on Educ. and Labor, 90th Cong., 1st Sess. (1967). By the first week of December 1967, a bill to be known as the "Age Discrimination Act of 1967" had passed both houses of Congress; soon thereafter, President Johnson signed it into law with an effective date of June 12, 1968.
 
 
 35
 The ADEA is a straightforward and lucid enactment. Its provisions include a mandate for public education on employment of persons in the protected-age category, a prohibition of age discrimination with certain express exceptions, an enforcement mechanism private as well as governmental, and an intergovernmental deferral scheme to ensure that the federal Act would complement rather than thwart state enforcement in those jurisdictions with similar state statutes. All of these provisions were designed, in the words of Congress, "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b) (1976); see Usery v. Tamiami Trail Tours, Inc., 531 F.2d 224, 228-29 & n.11 (5th Cir. 1976). Explicit in the Act is the general premise that age is an unlawful factor upon which to base employment decisions among job applicants, or as in the case at hand, job incumbents.
 
 B. Case Law
 
 36
 Since our decision in Hodgson v. First Federal Savings & Loan Association, 455 F.2d 818 (5th Cir. 1972), the maiden age discrimination case in this circuit, we have had few occasions to address squarely the elements of a prima facie ADEA case. Much of our thinking on that score has been molded by McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a race-discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1976). In McDonnell, respondent Green had been "laid off in the course of a general reduction in petitioner's work force," 411 U.S. at 794, 93 S.Ct. at 1820; petitioner's refusal to rehire Green precipitated the suit. A prima facie case by a Title VII plaintiff should include four elements, the Court held:
 
 
 37
 (i) that he belongs to a racial minority;
 
 
 38
 (ii) that he applied and was qualified for a job for which the employer was seeking applicants;
 
 
 39
 (iii) that, despite his qualifications, he was rejected; and
 
 
 40
 (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.
 
 
 41
 Id. at 802, 93 S.Ct. at 1824 (footnote omitted). The factual variety of Title VII cases, however, prompted the Court to caution that "specification ... of the prima facie proof required from this respondent is not necessarily applicable in every respect to differing factual situations." Id. at 802, n.13, 93 S.Ct. at 1824.
 
 
 42
 The ADEA is, of course, a statute independent of Title VII. Congress chose not to amend Title VII to include "age" as a protected category but rather enacted a specific statute that, in certain important respects, parallels Title VII. The significance of the statutes' similarities and differences has confounded the courts, as one commentator has observed:
 
 
 43
 Courts that have decided cases under the ADEA ... have vacillated in the degree of protection which they have afforded to older workers. While some have applied the precedents developed under Title VII, others have reached results which seem inconsistent with Title VII decisions; indeed (the Sixth Circuit) has explicitly held that the existence of a separate statute indicates the propriety of imposing a less rigorous degree of judicial scrutiny.
 
 
 44
 Note, The Age Discrimination in Employment Act of 1967, 90 Harv.L.Rev. 380, 382 (1976) (footnotes omitted). On the prima facie case issue, our Court was for several years cautious not to assume McDonnell 's applicability outside the Title VII area. E. g., Lindsey v. Southwestern Bell Telephone Company, 546 F.2d 1123, 1124 (5th Cir. 1977) (applicability "is presently unclear"); Wilson v. Sealtest Foods Division of Kraftco Corporation, 501 F.2d 84, 86 (5th Cir. 1974) (noting "much debate" by parties over applicability but declining "to rely solely upon McDonnell ").
 
 
 45
 However, two subsequent decisions of this Court in effect adopted the McDonnell Douglas factors as an appropriate test of a prima facie case under the ADEA. Price v. Maryland Casualty Company, 561 F.2d 609, 612 (5th Cir. 1977); Marshall v. Goodyear Tire & Rubber Company, 554 F.2d 730, 735 (5th Cir. 1977). Both cases cited McDonnell Douglas as a pathfinder. Marshall, though, clearly acknowledged that "McDonnell Douglas (did) not establish an immutable definition of a prima facie case," 554 F.2d at 735. We further observed in Marshall that the McDonnell Douglas Court itself had recognized the factual variety of discrimination cases and the corresponding need for a flexible view of a prima facie discrimination case. Still, in Price we set out four sufficient but not exclusive elements of a prima facie case under ADEA: "Thus, to show a prima facie case of age discrimination, the plaintiff must show that (1) he was a member of the protected group, (2) he was discharged, (3) he was replaced with a person outside the protected group, and (4) he was qualified to do the job." 561 F.2d at 612.
 
 
 46
 Discrimination exists, to be sure, "in forms as myriad as the creative perverseness of human beings can provide," McCorstin v. United States Steel Corporation, 621 F.2d 749, 753-54 (5th Cir. 1980). That the prima facie elements of Price were inapposite to a genre of age discrimination cases first became apparent in the district courts. E. g., Moore v. Sears, Roebuck & Company, 464 F.Supp. 357 (N.D.Ga.1979). In Moore, as in this case, a defendant corporation as part of a massive personnel reduction eliminated the positions held by plaintiffs. There, the district court correctly "perceive(d) ... the notion of a prima facie case in a discrimination action (as) a fluid one." Id. at 362. While we will of course apply the Price elements in proper cases, we have clearly held that they do not constitute "the alpha and omega of possible tests" under the ADEA. McCorstin, supra, 621 F.2d at 753. Reduction-in-force cases are obviously outside the embrace of Price since reduction-case plaintiffs are simply laid off and thus incapable of proving the third Price element, i. e., actual replacement by a younger employee. But it is beyond peradventure that a statute which expressly endeavors "to prohibit arbitrary age discrimination in employment," 29 U.S.C. § 621(b) (1976), in fact covers reduction-in-force cases.
 
 C. Specific Contentions on Cross Appeal
 1.
 
 47
 GM's first charge, that the district court's failure to require each plaintiff to demonstrate actual replacement by an individual outside the "protected age group" constituted error, is easily dismissed in light of our earlier discussion of Price and McCorstin. Even in the absence of one-for-one replacement of an older employee by a younger one, an employer can, with marked facility, practice age discrimination in a reduction-in-force scenario. Thus an ADEA plaintiff under such circumstances need not show actual replacement. See Part III. B. supra.
 
 2.
 
 48
 GM's major contention[11] on cross-appeal is that its legal obligation under the ADEA "is to make a fair and non-discriminatory choice between those persons who were actually considered for a position." Most of the legal argument supporting this contention is obstinately cast in terms of a job replacement case, reflecting GM's refusal to concede that the facts sub judice constitute a paradigm "reduction-in-force" case. Nonetheless, the specific errors that GM asserts, namely, the district court's refusal to sustain this position in the court's decision on GM's directed verdict motion, and the district court's refusal to charge the jury along the suggested lines, merit our serious consideration.
 
 
 49
 Rephrasing the contention to conform to the facts as we see them, GM argues, in effect, that an ADEA plaintiff should be required in a reduction-in-force setting to show that defendant consciously refused to retain plaintiff as an employee because of his age. This showing would be satisfied if plaintiff introduced evidence that during a reduction defendant consciously refused to retain plaintiff in his present position because of his age or consciously refused to consider relocating plaintiff within the enterprise because of his age. GM advocates a "conscious refusal" standard to avoid the type of proof introduced in the trial of this case. Rather than requiring plaintiffs to present evidence of discriminatory intent, the district court, GM asserts, permitted testimony as to the general "interchangeability" of plant jobs to suffice. GM further suggests that merely because a plaintiff testifies he was capable of handling one or two or many salaried jobs other than his own, yet was not relocated to such a job during the reduction, is not enough to show violation of the ADEA. We agree with this argument in principle and accordingly reverse on this point. We delineate precisely the extent of our agreement and the considerations that should govern subsequent similar cases.
 
 D. Prima Facie Showing in Reduction Cases
 
 50
 Drawing upon Price, McCorstin, and the legislative history of the ADEA, we hold that a plaintiff in this job reduction case could have established a prima facie case by: (1) satisfying the "standing requirements under the statute," McCorstin, supra, 621 F.2d at 753, i. e., showing that he is within the protected age group and that he has been adversely affected discharged or demoted by defendant's employment decision; (2) showing that he was qualified to assume another position at the time of discharge or demotion; and (3) producing evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.[12] While the first two requirements have appeared with frequency in age discrimination cases, the third one is tailored to the reduction-in-force facts such as those before us and requires some amplification.
 
 
 51
 The third requirement is based upon our understanding of the duty the ADEA imposes upon an employer. The ADEA mandates that an employer reach employment decisions without regard to age, but it does not place an affirmative duty upon an employer to accord special treatment to members of the protected age group.[13] The age of a "protected" job applicant or incumbent, then, is accorded neutral status under the ADEA, neither facilitating nor hindering his employment, his chances for advancement, or his exposure to demotion or discharge. Our third requirement simply insists that a plaintiff produce some evidence that an employer has not treated age neutrally, but has instead discriminated based upon it. Specifically, the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) defendant regarded age as a negative factor in such consideration.
 
 
 52
 To be sure, this can be done in many ways. Direct evidence of discriminatory intent, e. g., a paper scrap with the notation "Lay-off Too Old" beside a plaintiff's name, would of course suffice. Circumstantial evidence, be it statistical evidence,[14] evidence of employer subterfuge,[15] or other forms,[16] also would suffice so long as it serves the general purpose of supporting the asserted proposition and excluding other propositions.[17] The motion by GM for directed verdict, and later the motion for J.N.O.V. in full, should have been granted, for plaintiffs have failed to establish a prima facie case under the ADEA, as delineated herein. Accordingly, all entries of judgment in favor of plaintiffs are
 
 REVERSED.[18]
 
 
 *
 District Judge of the Northern District of Georgia, sitting by designation
 
 
 [1]
 James L. Williams, Jr., L. C. Allen, William N. Bailey, William J. Bales, James G. Boles, Thomas Collins, Roy Davison, Ralph Dodd, Harold E. George, Sr., C. J. Harper, Wallace R. Houston, Jacob Johnson, Franklin D. Kyle, William W. Landers, Horace W. McGinnis, Walter B. Mitchell, William P. Roberson, Herschel Vaughn, and Bobby Murray are plaintiffs-appellants, as well as cross-appellees in Nos. 79-2857 and 80-7192. Throughout they are collectively referred to as "plaintiffs."
 
 
 [2]
 Williams, Allen, and Davison
 
 
 [3]
 No plaintiff was actually "replaced" by another employee at the time of the reduction. Rather, the sole remaining shift was reconstituted and, in fact, drew its staff from both pre-reduction shifts. It is noteworthy and undisputed that the positions held by 15 of the 19 plaintiffs were staffed during reduction by employees aged 40-65 and thus "protected" by the ADEA as it read at that time. Moreover, four of those 15 positions on the reconstituted shift were filled by GM employees older than the plaintiffs who had occupied such positions on one of the two pre-reduction shifts
 
 
 [4]
 Allen, Bailey, Bales, Boles, Collins, Davison, Dodd, George, Harper, Johnson, Landers, McGinnis, Mitchell, Roberson and Williams. (GM also moved against plaintiff Ford, whose case was consolidated with the others for trial purposes only; a verdict was, in fact, directed against Ford whose appeal is the subject of Ford v. Gen'l Motors Corp., 656 F.2d 117 (5th Cir. 1981), which we also decide today.)
 
 
 [5]
 At all times relevant to this trial the protected age group was 40-65. See Pub.L.No.90-202, § 12, 81 Stat. 602. Congress, however, in 1978 amended the Act to set the upper limit at age 70. See 29 U.S.C.A. § 631(a) (Cum.Supp.1980)
 
 
 [6]
 We understand from the record, see Record, No. 79-2857, Vol. XV, at 2350-53, that verdicts were directed against both Collins and Johnson as to legal relief only. At the time of the directed verdict, the district judge had not yet considered the issue of injunctive relief
 
 
 [7]
 At trial, the district court reserved decision on whether potential jury awards should be reduced by amounts of vacation pay
 
 
 [8]
 "(P)laintiffs' counsel," wrote the district court, "were retained under a contract providing for a fee equal to the greater of forty percent of all amounts recovered by their clients, which amounts to $14,669.85, or such amount as this court might award as a reasonable fee." Record, No. 80-7192, at 94
 
 
 [9]
 In his "Brief in Support of Plaintiff's Motion to Expand Time for Transmitting the Record," filed in the district court, Record, No. 79-2837, Vol. XV, at 5144, Collins stated that because of the entry of judgment against him, he was "forced into the position of having to file a Notice of Appeal immediately." His fear was that if the district court did not include him within the reach of injunctive relief, he would be regarded as having been dismissed in toto on March 16. The fear was unfounded. Since the March 16 order, in the operative words of Rule 54(b), "adjudicate(d) the rights and liabilities of fewer than all the parties" that order was nonfinal and "subject to revision." See Fed.R.Civ.P. 54(b)
 
 
 [10]
 Liberal application of Fed.R.App.P. 3(c) (Content of Notice of Appeal) is not to be confused with our traditionally strict reading of the timeliness requirement of Fed.R.App.P. 3(a) & 4(a). Phillips v. Insurance Company of North America, 633 F.2d 1165, 1166 (5th Cir. 1981); see Browder v. Director, Dep't of Corrections of Illinois, 434 U.S. 257, 264, 98 S.Ct. 556, 560, 54 L.Ed.2d 521 (1978)
 
 
 [11]
 GM has also raised other points on cross-appeal. Notably, GM has charged that the cumulative effect of several alleged district court errors irreparably prejudiced defendant's case. To some extent where relevant, we have combined arguments on that point with our discussion of what we consider GM's "major contention." We regard it important however, to briefly address and dismiss one additional contention GM raises, namely, the allegation that the district court erred by preventing GM from examining its own "managing agents" when called by plaintiffs to testify on cross-examination. This action by the district court was within its discretion, of which we find no abuse. See Fed.R.Evid. 611(a). GM later was afforded the opportunity to call its managing agents and was not prejudiced by the district court's actions
 
 
 [12]
 We hastily add, however, that these requirements are not etched in granite and they do not beckon fanatic adherence. "The facts necessarily will vary ..., and the specification above of the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations." McDonnell Douglas, supra, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824
 
 
 [13]
 This statement arguably represents a departure from certain principles applied under Title VII, but cf. Texas Dep't of Community Affairs v. Burdine, --- U.S. ----, ----, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); it flows, however, directly from the ADEA's legislative history and avowed purpose. Senator Javits, ranking minority committee and subcommittee member during the 1967 Senate hearings on the proposed Act, told his colleagues that the effect of the legislation would be to "emphasize the ability and capability of the worker to do the job, rather than his age level ...." Age Discrimination in Employment: Hearings on Age Discrimination Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 90th Cong., 1st Sess. 28 (1967). The relevant House report clearly declared "(i)t is, of course, not the purpose of this legislation to require the employment, regardless of age, of one not otherwise qualified." H.R.No.805, 90th Cong., 1st Sess. reprinted in (1967) U.S.Code Cong. & Admin.News 2213, 2220. Moreover, the express purpose written into the ADEA by Congress was "to promote employment of older persons based on their ability ...." 29 U.S.C. § 621(b) (1976). The protection sought to be afforded members of the protected age group, then, was that their employers would disregard age in favor of ability as the basis for employment decisions
 
 
 [14]
 See Lindsey v. Southwestern Bell Tel. Co., 546 F.2d 1123, 1124 (5th Cir. 1977) (statistical evidence alone might suffice but statistical evidence presented does not); Hodgson v. First Fed'l Savings & Loan Ass'n, 455 F.2d 818, 823 (5th Cir. 1972) (statistics plus specific incidents of discriminatory conduct supported finding of an ADEA violation); Schulz v. Hickok Mfg. Co., 358 F.Supp. 1208, 1213 (N.D.Ga.1973) ("steep decrease" in average age of district managers relevant to prima facie case); Levien, The Age Discrimination in Employment Act: Statutory Requirements and Present Development, 13 Duq.L.Rev. 227, 236-37 (1974). Cf. Rowe v. Gen'l Motors Corp., 457 F.2d 348 (5th Cir. 1972) (Title VII)
 We caution, however, that statistical evidence has no magical properties. A district court should consider the extent to which it reasonably supports the theory that the proponent advances. The statistical showing by plaintiffs here, see pp. 122-123 supra, was inconclusive at best. Indeed, the expert's admission that as age increased so did likelihood of retention during the reduction supports a proposition diametrically opposed to plaintiffs' case.
 
 
 [15]
 Convincing evidence on this score, for example, would point to an employee-rotation plan that effectively shifted "protected" workers into jobs likely to bear the brunt of a reduction in force. While plaintiffs alleged this in the present case, the district court, we observe, found their evidence unconvincing
 
 
 [16]
 GM has urged that recovery be permitted under the ADEA only when a plaintiff has proved he was "individually impacted by a discriminatory decision." We agree but our agreement should not be misconstrued to limit the role of circumstantial evidence in a prima facie case. We do not doubt, for example, that a demoted plaintiff, who is within the protected age category and who is qualified for a job other than his own, may introduce statistics so convincing as to suggest reasonably that his demotion was based upon age
 
 
 [17]
 We are obliged to point out several misconceptions of the ADEA evident in the record and related evidentiary admissions that simply did not support plaintiffs' assertion of age discrimination. First, the bare fact that an employer encourages employment of recent college and technical school graduates does not constitute unlawful age discrimination. Only when those recruits are insulated from reduction at the expense of employees within the protected age group is the ADEA implicated. Second, seniority and age discrimination are unrelated. The ADEA targets discrimination against employees who fall within a protected age category, not employees who have attained a given seniority status. This is borne out, to be sure, by the simple observation that a 35-year old employee might have more seniority than a 55-year old employee. This confusion between seniority and age discrimination pervaded the trial. Several witnesses testified that their seniority should have assured them more favorable results during the reduction in force. See Record No. 79-2857 Vol. IX, at 441-42; id., Vol. X, at 905. During closing argument to the jury, plaintiffs' counsel further alluded to "seniority," stating: "A lifetime of work at General Motors, ... twenty-five years on the concrete out there working and breaking apart. Is this the reward(:) they have to go against their own employer?" Id., Vol. XIX, at 3038. Even the briefs plaintiffs have filed in this Court contain reference to seniority. E. g., Appellants' Brief in Response to Brief on Behalf of Appellee and Cross-Appellant, at 16 ("The record in the instant case reveals that there were many younger employees with less seniority retained ...."); 17 ("In the presence of the seniority system, defendant does, indeed have the obligation to consider a plaintiff ... if the plaintiff is more senior ...."). We state without equivocation that the seniority a given plaintiff has accumulated entitles him to no better or worse treatment in an age discrimination suit
 
 
 [18]
 Entries of judgment against certain plaintiffs on the question of damages (Bailey, Bales, Boles, Collins, Dodd, Harper, Johnson, Landers, McGinnis, Mitchell, Roberson, and Vaughn) are accordingly AFFIRMED
 Our disposition obviates the need to consider numerous arguments advanced on this appeal. Foremost among these are: (1) plaintiff's case for injunctive relief; and (2) plaintiff Murray's "continuing discrimination" argument. Furthermore, as a result of our disposition, we do not consider plaintiffs' attorneys' fees argument but instead must vacate the district court's award of such fees.