**Glenn A. GARIG**

v.

**N.L. INDUSTRIES, INC.**

No. H–83–5890.

United States District Court,
S.D. Texas,
Houston Division.

May 8, 1985.

David T. Lopez, Houston, Tex., for plaintiff.

Frank C. Morris, Epstein, Becker, Borsody & Green, Washington, D.C., for defendant.

## MEMORANDUM

MORTON, Senior District Judge (Sitting by Designation).

This is an action pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621–634 (hereinafter ADEA). All jurisdictional prerequisites have been satisfied. For the reasons set forth in the following findings of fact and conclusions of law, see Fed.R.Civ.P. 52, judgment shall be entered for the defendant.

The plaintiff was hired as a pilot by the defendant's predecessor on April 27, 1966. He was assigned to the Houston, Texas flight center. He remained there until his termination on May 31, 1983. The proof showed that the plaintiff was an excellent employee and highly qualified pilot. At the time he was terminated, the plaintiff was rated as "pilot-in-command" on what had been the defendant's two largest and most sophisticated planes: The Grumman Gulfstream (hereinafter G–1) and Sabreliner jet.

"Pilot-in-command" was a phrase used by the defendants to designate those pilots whom it deemed qualified to captain a given plane. In order to be rated pilot-in-command of a plane, pilots had to undergo training and meet standards in excess of the FAA requirements for that plane. The defendant required all of its pilots to be rated as pilot-in-command on at least one of the planes it had in active service.

The defendant is an oil service company. In 1982, it began to feel the effects of a general downturn in the oil industry. Responding to economic pressure, the defendant began a reduction in force that was continuing at the time of trial.[1] The first reductions in the defendant's flight services sector took place in August or September of 1982. At that time, four pilots were terminated.

By April of 1983, Walter Schultz, vice president in charge of flight services, decided that further reductions were necessary. After conferring with Richard Smith, director of corporate aviation, Schultz gave the order to shut down the Bridgeport, Connecticut and Denver, Colorado flight centers altogether. The Sabreliner operating out of Bridgeport was to be moved to Houston and sold. The King Air at Denver

---

1. In April of 1982, the defendant employed 27,-000 people. By the time trial was held, its work force was down to 7,500.

was to be brought to Houston and placed in rotation with the two King Airs there. In Houston, the G–1 was to be placed in "serviceable storage." The G–1 was stored because the defendant was temporarily closing Solimar, its recreation facility at South Padre Island, Texas. The G–1 was primarily used as a party plane to ferry customers and executives back and forth to Solimar.

In executing these reductions, Schultz instructed Smith that there would be no retraining or relocating of personnel. In other words, if a location were closed or plane taken out of service, the persons primarily identified with that location or plane were to be terminated. In accordance with this policy, all the employees at the Bridgeport and Denver facilities were fired. Smith decided that Henry Wunderlich, the plaintiff, and one mechanic were the persons primarily identified with the G–1. Consequently, those three persons were terminated at the Houston facility.

The plaintiff contends that the defendant terminated him because of his age. He assails the defendant's proffered explanation for his discharge as a pretext thrown up to conceal its unlawful purposes. In the alternative, the plaintiff alleges that Alan Dimiero, the defendant's chief pilot at Houston, refused to have the plaintiff trained as pilot-in-command of the Falcon 50 because of his age. The defendant kept the Falcon 50 in active service after May of 1983. The plaintiff argues that Dimiero's allegedly discriminatory action was the proximate cause of his discharge.

■ Barring direct evidence of discrimination, the framework of proof laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) applies to ADEA cases. *See e.g., Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Bohrer v. Hanes Corp.*, 715 F.2d 213 (5th Cir.1983); *Reeves v. General Foods Corp.*, 682 F.2d 513, 520 (5th Cir.1982). With reference to reduction in force cases in particular, an ADEA plaintiff makes out a prima facie case by showing: (1) he was within the protected age group and adversely affected by the defendant's action; (2) he was qualified to assume another position; and (3) the defendant intended to discriminate against the defendant in taking the challenged action. *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

There is no doubt that the plaintiff's termination at age 53 satisfied the first element of a prima facie case. Nor is there much doubt that the plaintiff could have easily been trained to fly one of the planes the defendant retained after May 31, 1983. Whether the defendant intended to discriminate against the plaintiff when it decided to terminate him is a much more difficult problem. Keeping in mind that the burden of proving a prima facie case is not an onerous one, *see Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), the court finds that the plaintiff produced sufficient proof to raise a doubt in a reasonable fact finder's mind as to whether he was a victim of discrimination. If nothing else, the fact that the defendant was carrying out its reduction in force for economic reasons coupled with the fact that the plaintiff was paid more than some of the pilots whom the defendant returned, *see* 29 U.S.C. § 623(a)(3), required the defendant to articulate some nondiscriminatory reason for the plaintiff's discharge. *See Burdine, supra*, at 254, 101 S.Ct. at 1094.

■ As noted above, the defendant's articulated reason for discharging the plaintiff was its decision to terminate employees associated with discontinued corporate functions without considering the possibility of relocating or retraining those employees. The court finds this was a legitimate nondiscriminatory reason for discharging the plaintiff.

The plaintiff did not prove that the defendant's proffered explanation for his discharge was pretextual. All the testimony indicated that the defendant required a pilot to be rated pilot-in-command on at least one of the planes used by it. There was no evidence that the pilot-in-command

requirement was instituted for discriminatory reasons nor that it was enforced in a discriminatory manner. All those pilots retained at the Houston facility were rated as pilot-in-command on either the Falcon 50 or King Air—the two types of planes that were kept in service after May 31, 1983.

Despite the defendant's apparently evenhanded application of its termination policy, the plaintiff alleged that that policy was a pretext for discrimination as applied to him. In support of this allegation he noted that the defendant continued to use the G–1 after his termination. He also argued that he could have been trained as pilot-in-command of King Air at little or no cost to the defendant.

It is true that between June of 1983 and September of 1984 the G–1 was used an average of 3.6 hours per month. Nine of those 16 months it was not used at all. Such an occasional use of the G–1 does not raise an inference that the plaintiff's termination was pretextual. Briggs, Dimiers, and Euton, all of whom were retained after May of 1983, were qualified as pilot-in-command of the G–1. Apparently, the defendant felt those pilots could fly the G–1 the few times it was used.

The plaintiff contends that the defendant could have trained him to be pilot-in-command of the King Air at little or no cost. The court disagrees. The proof showed that the defendant would have had to have paid something to have the plaintiff meet its pilot-in-command standards.[2] Those standards are higher than the FAA's which the plaintiff might have been able to satisfy at no cost. Assuming the plaintiff could have retrained for nothing, that alone would still not raise an inference of discrimination. There was no proof that men younger than the plaintiff were retrained after May of 1983. Although there was proof that the plaintiff was highly qualified, the weight of the evidence did not show he was more qualified than the pilots who were retrained to fly the King Airs.[3] Quite frankly, the court was left with the impression that the plaintiff felt he should have been accorded special treatment because of his seniority. It is well settled that the ADEA does not protect expectations fostered by seniority. *Williams, supra,* at 130 n. 17. The court finds that the plaintiff's age did not play a part in the defendant's decision not to retrain him.

Finally, the plaintiff relied upon Dimiero's statement to him that the defendant's termination policy was merely a ruse to discharge the highest paid workers. *See* 29 U.S.C. § 623(a)(3). The problem with Dimiero's statement is that he admitted that he was not privy to the decision as to who would be terminated and why. Dimiero's hypothesis was no more based on fact than any outsider's would have been. Ad-

---

2. The defendant alleged it would have cost $7,300 to train the plaintiff as pilot-in-command of a King Air. In addition, the plaintiff would have had to have flown as pilot-in-command of the King Air for 60 hours while under supervision.

Henry Wunderlich, who is now a G–1 instructor at Flight Safety International, admitted that the $7,300 figure was correct, but argued that it would not apply in the plaintiff's case. He testified that the difference between initial and refresher training was 2 days. He claimed that the plaintiff's experience could compensate for the 2–day differential. Since the defendant had a contract with Flight Safety to provide refresher training for its pilots, Wunderlich opined that it would not have cost anything extra for the defendant to have the plaintiff trained as pilot-in-command of a King Air.

Lloyd Gray, the manager of Flight Safety, declined to speculate as to what it would have cost the defendant for the plaintiff's initial training on a King Air.

While Wunderlich was familiar with the technical requirements of Flight Safety's operations, he did not profess to be familiar with its pricing policies. The court is not persuaded that Flight Safety would have been willing to provide a different kind of training than it had contracted for free of charge.

3. Wunderlich did testify that he once asked to be trained as pilot-in-command of a King Air because he felt some of the pilots flying those planes were deficient. As noted below, the court weighed Wunderlich's testimony with some care because he still appeared to be bitter over his own termination. Furthermore, given the fact that all of the defendant's pilots had exceeded the FAA standards for the planes they flew, the court was not persuaded by Wunderlich's unsubstantiated opinion on this point. He only gave his opinion. He did not give any examples to support that opinion.

mittedly, the facts are suspicious: a highly paid employee is terminated during a reduction in force motivated by an economic crisis. Those facts alone, however, are insufficient to persuade the court that the defendant's articulated explanation for the plaintiff's discharge is pretextual. Indeed, were economics the sole criteria, one would have expected that Dimiero and Meadows, both of whom made more than the plaintiff, would have been terminated.

The plaintiff alleges that even if age was not a factor in Schultz's and Smith's decision to terminate him, age was a negative factor in Dimiero's decision not to train him as pilot-in-command of the Falcon 50. The plaintiff alleges that this discriminatory act by Dimiero was the proximate cause of his subsequent discharge; therefore, his discharge was in violation of the ADEA.

In July of 1982, the defendant replaced one of its Sabreliner jets with a Falcon 50 jet. In September of 1982, the plaintiff requested to be trained as pilot-in-command of the Falcon 50. It is unclear whether the plaintiff made his request before or after Dimiero designated the pilots who would be trained as pilot-in-command of the Falcon 50. At any rate, the plaintiff was never trained to fly the Falcon 50. Instead Dimiero, Euton, Keeler and Briggs were trained to fly that plane. At the time they were chosen to fly the Falcon 50 Dimiero was 50 years old, Euton 51, Keeler 36, and Briggs 35. In support of his theory that Dimiero's refusal to train him was based on his age, the plaintiff introduced the testimony of Henry Wunderlich. Wunderlich testified that Dimiero had told him several times that he did not like older men in the cockpit.

Based on the evidence presented to it, the court is not persuaded that Dimiero refused to assign the plaintiff to the Falcon 50 because of his age. Dimiero denied ever stating that he did not like to see older men piloting plans. On this point, the court finds Dimiero's testimony more credible than Wunderlich's. The court was of the opinion that Dimiero's compassion for the plaintiff's predicament was sincere. If Dimiero really disliked older pilots, he would have had no reason to feel sorry for the plaintiff. Furthermore, Wunderlich testified that Dimiero often stated his dislike of older pilots; yet, Wunderlich was the only witness who remembered hearing those statements. Finally, Wunderlich's testimony and demeanor convinced the court he was still bitter over his own termination and likely to exaggerate.

Even if Dimiero had made the statements alleged by Wunderlich, there was nothing else in the record to indicate he made the assignments to the Falcon 50 on the basis of age. The plaintiff did not show that he was as qualified to fly the Falcon 50 as the men who were trained to fly it. Half of those pilots assigned to fly the Falcon 50 were only a year or two younger than the plaintiff. In short, there were too many doubts in the court's mind for it to hold that Dimiero discriminated in assigning pilots to the Falcon 50 on the basis of age.

To summarize, the plaintiff has failed to persuade the court that he was discharged from his job because of age discrimination. The proof showed that the plaintiff was the unfortunate victim of circumstances. He held a very prestigious job in the defendant's aviation section. He enjoyed flying the G–1. Neither he nor Dimiero knew the G–1's days were numbered; therefore, they perceived no need to train him on a less sophisticated plane. When the defendant decided to reduce its work force, it did so in an objective, nondiscriminatory manner. Whether its application of its policy was heartless or unethical is legally immaterial.

An appropriate order shall be entered.