| | Historical Production | Current Production | Texaco Classification | | DOE Classification | |
|---|---|---|---|---|---|---|
| | | | "Old" | "New" | "Old" | "New" |
| Entity A | 100 | 50 | 50 | | | |
| Entity B | 100 | 80 | 80 | | | |
| Entity C | 100 | 120 | 100 | 20 | | |
| Entity D | 0 | 50 | 0 | 50 | ___ | ___ |
| Totals | 300 | 300 | 230 | 70 | 300 | 0 |

Under Texaco's entity by entity approach, 70 barrels of oil could be classified as new and not be subject to the price ceiling. Under DOE's approach, all oil would be subject to the ceiling.

Jonah OXMAN, on Behalf of Himself and Numerous Others Who Are Similarly Situated, Plaintiff,

v.

WLS–TV, Defendant.

No. 84 C 4699.

United States District Court, N.D. Illinois, E.D.

May 10, 1985.

---

Daniel J. King, Jenner & Block, Chicago, Ill., for plaintiff.

Gilbert Feldman, Cornfield & Feldman, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Jonah Oxman's ("Oxman") complaint alleges that defendant WLS–TV fired him from his employment at WLS–TV because of his age.[1] Before the court now is Oxman's motion for summary judgment on Count II of that complaint, brought under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* (1976) ("ADEA"), and WLS's cross motion for summary judgment. For the reasonsd stated below, both motions are denied.

## FACTS

Oxman, 61, worked for WLS–TV for about sixteen years. He joined WLS–TV as a newswriter on July 24, 1967, following thirteen years as a newswriter-producer at WBBM–TV and nine months at WMAQ–TV. After four months in the newswriter position, Oxman became a management employee in the newsroom at WLS–TV. The duties of this position included supervision of the newsroom in the absence of the News Director and the supervision of the station's four film crews. In 1968 with the hiring of William Fyffe as News Director, Oxman's title was changed to Business Manager. His duties expanded to include budgeting, scheduling, purchasing, personnel, labor relations and legal affairs. For six months in 1978, Oxman held an Executive Producer position, but his job duties remained the same. During a twenty week strike in 1977, Oxman worked as a newswriter and Associate Producer, producing two shows daily.

The circumstances leading to Oxman's termination occurred as follows. In 1981, WLS–TV created the "Northwest Bureau," primarily for the purpose of covering news stories in the northwest suburbs. This was the only suburban Bureau WLS–TV had. Oxman was named as manager of the Bureau. The Bureau staff also included two camera crew members and a reporter. Oxman's position as Bureau Manager afforded him the opportunity to have more journalistic responsibilities than the administrative responsibilities he had in his former position. As Bureau Manager, Oxman worked with the assignment desk developing stories and assuring their coverage.

In mid–1983, rumors began to circulate that then General Manager Dennis Swanson ("Swanson") and then News Director William Applegate ("Applegate") wanted to close the Northwest Bureau as part of their plan to cut expenses and improve efficiency at WLS–TV. After Oxman heard these rumors he asked if they were true. Oxman was reassured that no decision to close the Bureau had been made, and that the station was happy with the quality of his job performance at the Bureau. In September, 1983, Kim Peterson, a Bureau reporter, was reassigned by Applegate to do morning news inserts on "Good Morning America", a network broadcast. Peterson no longer reported to the Bureau, and her position as Bureau reporter was not filled. Because of Peterson's reassignment, the Bureau started covering fewer stories. In late December, 1983, Swanson made the final decision to close the Bureau as of January 27, 1984. The crew assigned to the Bureau began to work out of WLS–TV's downtown offices from where they

1. As an earlier opinion in this case noted, *see Oxman v. WLS–TV,* 595 F.Supp. 557 (N.D.Ill. 1984), the complaint as originally written also alleged race and religious discrimination on behalf of a class. All that is left now is Oxman's individual age discrimination claim.

continued covering news stories in the Chicago area. At about the same time, certain personnel and news directors at WLS–TV began to discuss the possibility of offering Oxman an early retirement package. The package was essentially a year's salary as an incentive for retiring. Oxman stated that he was not ready to retire and wanted to continue at WLS–TV in another capacity.

On January 5, 1984, Oxman learned that he was going to be fired. At a meeting on January 10, 1984 with Applegate, Oxman again stated his desire to continue working for WLS–TV. Applegate denied that there were any positions available for Oxman. Oxman says that Applegate told him that the news business had grown very complex in recent years and that if Oxman took a job as a producer that he knew that within a week they would discover that Oxman could not do the job. Applegate stated that there was a job freeze and that age was not a factor in Oxman's termination. Oxman was terminated on January 27, 1984, the day the Bureau closed.

## LEGAL BACKGROUND

Both plaintiff and defendant have filed motions for summary judgment on the issue of whether WLS–TV violated the ADEA by discharging and failing to transfer Oxman to another position at the station. Summary judgment is generally inappropriate in employment discrimination cases because so much often depends on an employer's credibility and his or her hidden or unconscious motives. *See Selsor v. Callaghan,* 609 F.Supp. 1003, 1006–1007 (N.D.Ill.1985) (Aspen, J.). Yet summary judgment has been affirmed in the less common cases where no evidence suggests that motive or intent is involved. *Parker v. Fed'l. National Mtg. Assn.,* 741 F.2d 975, 979–81 (7th Cir.1984); *Huhn v. Koehring Co.,* 718 F.2d 239, 243–45 (7th Cir.1983). As in any case, summary judgment will be granted only if "no genuine issue as to any material fact" exists. Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that there is no genuine factual issue, *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984), and the Court must view the evidence, as well as the reasonable inferences drawn from the evidence, in the light most favorable to the party opposing the motion. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984).

Section 623 of the ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a). The plaintiff bears the ultimate burden of proving that he was discharged because of his age. *LaMontagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984). To meet this burden the plaintiff must prove that age was a "determining factor" in the sense that he would not have been discharged "but for" his employer's motive to discriminate against him on the basis of his age. *LaMontagne,* 750 F.2d at 1409. The plaintiff may use one of two methods of proof. The plaintiff can meet the burden directly by presenting direct or circumstantial evidence that age was a determining factor in the decision to discharge. *Id.* Alternatively, the plaintiff can prove his case indirectly by following the more common burden shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *E.g., LaMontagne,* 750 F.2d at 1409.

Under the usual *McDonnell Douglas* approach,[2] the plaintiff is required to make out a prima facie case of discrimination by showing (1) that he was in the protected class, (2) that he was doing his job well enough to meet his employer's legitimate expectations, (3) that he was discharged despite the adequacy of his job performance, and (4) that the employer sought a replacement for him. *LaMontagne,* 750 F.2d at 1409 (footnote omitted).

2. Although *McDonnell Douglas* was a Title VII case, the lower courts have modified its formula for use in ADEA cases. *See LaMontagne,* 750 F.2d at 1409 nn. 1 & 2.

If the plaintiff successfully meets this burden, he will have established a rebuttable presumption that he was discharged because of his age. However, the employer may rebut this presumption if he can articulate a lawful reason for the discharge. The defendant's burden is only one of production; the burden of persuasion remains with the plaintiff at all times. *Id.* If the defendant is successful in rebutting the presumption, the burden falls on the plaintiff to prove that the articulated reasons are merely pretextual, by showing either that the defendant was more likely motivated by a discriminatory reason, or that the defendant's proffered explanation is unworthy of credence. *Id.*

In the present case Oxman has relied on the *McDonnell Douglas* indirect method of proof. It is undisputed that at the age of 61, Oxman was within the protected age group at the time of discharge, that he was performing his job to the satisfaction of WLS, that he was discharged despite the adequacy of his performance. The parties dispute, however, the existence and relevance of the fourth element, that is, whether WLS sought a replacement for Oxman.

This is not the typical termination case in which an older employee has been fired and replaced. Oxman was fired as part of a structural re-organization. WLS–TV correctly points out that Oxman cannot meet element number four as currently defined because his position no longer existed; thus, WLS–TV could not "replace" him. But WLS–TV concludes simply from this fact that Oxman thereby cannot prove his *prima facie* case. It asserts that we should deny his termination case and treat Oxman as a new applicant for other positions which opened up when he was fired, applying the "applicant" version of the *McDonnell Douglas* formula.[3] In contrast, Oxman reformulates the fourth element in a way which, in effect, collapses the two-step approach taken by WLS–TV. He retains the first three elements, and argues that he meets a fourth element which he defines as "at or near the time of termination WLS–TV had vacancies in positions that Oxman was qualified for." He cites no cases prescribing his exact formulation. Both parties' approaches are a bit confused, which is not surprising, since this case simply does not fit the usual *McDonnell Douglas* formula. To arrive at a sensible approach, we must review the origin and purposes of the *McDonnell Douglas* formula, and then tailor that formula to fit the unusual facts of this case.

The *McDonnell Douglas* indirect method of proof deals with the practical problem that many discrimination cases will yield no direct evidence of discrimination. The formula was created as a means of ruling out typical non-discriminatory reasons for hiring or firing, which thereby produces a common-sense inference of unlawful age discrimination, even where the plaintiff presents no evidence that age motivated the employer. *See, e.g., LaMontagne,* 750 F.2d at 1409–10. But as we recognized in our earlier opinion in this case, *Oxman,* 595 F.Supp. at 563, the formula is neither "rigid, mechanized or ritualistic." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). In creating the test, the Supreme Court wrote that the test will sometimes have to be changed to adapt to varying fact situations. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *see Williams v. General Motors Corp.,* 656 F.2d 120, 129 n. 12 (5th Cir.1981) (modifying test in ADEA "reduction-in-force" case), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

It is clear that the usual test as stated in *LaMontagne* cannot be applied to a case like this, where the job position was eliminated. The fourth element is inapplicable

3. That version requires that the plaintiff prove: (i) that he belongs to [the protected age group]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (modified to age context).

in such a case because by definition it can never be met. We therefore reject WLS-TV's wooden argument that Oxman cannot prove his *prima facie* case because he cannot prove the fourth element. WLS-TV's approach creates an impossible hurdle for plaintiffs in job-elimination cases, an impossibility which could encourage devious employers to fabricate "job eliminations" in order to evade the fourth element of the usual approach.[4]

This case is most akin to the so-called "reduction-in-force cases," in which plaintiffs usually allege that employers discriminate on the basis of age in reducing or restructuring their work forces. These cases have approached the issue in two different ways. One line of cases, beginning with *Williams v. General Motors Corp.*, 656 F.2d 120 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982), injected an element of intent into the *McDonnell Douglas* formula. Dealing with massive lay-offs at an auto plant, the Fifth Circuit recognized, as we do above, that the traditional approach is unworkable because the fired, older employee is never "replaced." 656 F.2d at 128. But the Court reasoned that a mere refusal to place the employee in a different position is not enough by itself to create an inference of discrimination. *Id.* at 129; *accord Matthews v. Allis Chalmers,* — F.Supp. —, 35 F.E.P. Cases 1404, 1405 (N.D.Ill.1984) (Decker, J) (employer who fires qualified older employee as part of reduction-in-force "does nothing inherently suspicious"). The Court held that some evidence of intent was necessary. Besides requiring a plaintiff to prove that he was (1) in the protected age group, (2) fired or demoted, and (3) qualified to assume an available position at the time of discharge or demotion, the Court required that he produce

> evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue. While the first [three] requirements have appeared with frequency in age discrimination cases, the [fourth] one is tailored to the reduction-in-force facts such as those before us and requires some amplification.

656 F.2d at 129 (footnote omitted). The Court "amplified" that this last requirement

> simply insists that a plaintiff produce some evidence that an employer has not treated age neutrally, but has instead discriminated based upon it. Specifically, the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) defendant regarded age as a negative factor in such consideration.

*Id.* at 129–30. Several other reduction-in-force cases have used or cited the *Williams* approach, most doing so without much elaboration. *See E.E.O.C. v. Western Elec. Co., Inc.*, 713 F.2d 1011, 1014–15 (4th Cir.1983); *Allison v. Western Union Telegraph Co.*, 680 F.2d 1318, 1321 (11th Cir.1982); *Matthews v. Allis-Chalmers,* — F.Supp. at —, 35 F.E.P. Cases at 1405 (adopting test similar to that in *Williams* without citing or discussing that case); *E.E.O.C. v. Trans World Airlines, Inc.*, 544 F.Supp. 1187, 1218 (S.D.N.Y.1982); *Franci v. Avco Corp.*, 538 F.Supp. 250, 256 (D.Conn.1982); *Deutsch v. Carl Zeiss, Inc.*, 529 F.Supp. 215, 218 (S.D.N.Y.1981).

Another line of cases has used a different fourth element, without even discuss-

4. WLS-TV's approach is also too formalistic and rigid in another way. It combines its impossible *prima facie* case with the "applicant" version of the formula. While logical in an abstract sense, this approach ignores Oxman's long employment experience at the station, and the evidence (which we discuss later) of how WLS-TV has treated other employees during its reorganization. His relationship with WLS-TV should not be viewed as that of an applicant and stranger. WLS-TV's reliance on our decision in *Smith v. World Book Childcraft Intern, Inc.*, 502 F.Supp. 96 (N.D.Ill.1980) is misplaced. Smith was not a reduction-in-force case and the employer sought a replacement for the fired employee. Thus, the usual *prima facie* case for termination was not absurd there, as it is here.

ing the first line of cases. One case, *Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342–43 (D.C.Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983), merely retained the fourth element normally used in the D.C. Circuit: the plaintiff must show that he was "disadvantaged in favor of a younger person."[5] *Id.* at 342. The Court rejected the employer's argument (adopted in *Williams*) that the reduction-in-force *prima facie* case requires some direct evidence that age was a factor in the decision:

> *Cuddy* [*v. Carmen,* 694 F.2d 853 (D.C. Cir.1982)] makes it clear that direct evidence of discrimination is not required to prove a prima facie case and create an inference of discrimination. *Id.* at 856–57. We believe the exigencies of a reduction-in-force can best be analyzed at the stage where the employer puts on evidence of a nondiscriminatory reason for the firing. In this manner the employee always retains the burden of proving discrimination while the employer's situation is analyzed on a case-by-case basis.

*Id.* at 343. The Third Circuit has adopted a similar test, requiring only that the plaintiff "easily" show that "others not in the protected class were treated more favorably." *Massarsky v. General Motors Corp.,* 706 F.2d 111, 118 & n. 13 (3d Cir. 1983), *cert. denied,* — U.S. —, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *see also Kneisley v. Hercules Inc.,* 577 F.Supp. 726, 730–31 (D.Del.1983) (following *Massarsky* test).

So far as we know the Seventh Circuit has never directly addressed the issue of the proper standard to apply in reduction-in-force cases. The case which comes closest to doing so, *Parker v. Federal National Mtg. Ass'n.,* 741 F.2d 975 (7th Cir.1984), appears more like the second line of cases than the first. The case involved job cutbacks in a business which bought and serviced mortgages. Through a two-step reorganization, Parker, at 62 the oldest employee in his unit, was first demoted and then fired, while other, younger employees received better treatment. The Seventh Circuit did not spell out the four *McDonnell Douglas* factors, perhaps because the case focussed on the issue of pretext, and the Court affirmed the granting of summary judgment to the employer on that issue. Nevertheless, the Court held that Parker would "have had little difficulty establishing a prima facie case" at trial. 741 F.2d at 979. The Court pointed out that Parker was well-qualified (thus satisfying element number 3) and, significantly, he "was not given the positions which Monico [age 31], Wright [age 55], Bromann [age 31], and Haren [age 57] filled, and ... was not allowed to 'bump' a Loan Representative." *Id.* The Court did not explicitly require any direct or indirect evidence of age discrimination, as the *Williams* court had done, in order to prove the *prima facie* case. Instead, the opinion is silently consistent with the *Coburn* and *Massarsky* test of requiring that the plaintiff be "disadvantaged in favor of a younger person."

We think the test used in *Coburn* and *Massarsky,* and *sub silentio* in *Parker,* is preferable to the *Williams* approach. The *Williams* test is internally inconsistent. By requiring a plaintiff to introduce direct evidence of intent in his *prima facie* case, the *Williams* test defeats one of the purposes of the *McDonnell Douglas* formula—allowing plaintiff to prove a *prima facie* case objectively, without having to exhume the direct evidence of intent buried in the mind of the employer. The *Williams* test also collapses the *prima facie* case with the third, or "pretext," step in the burden-shifting game. And it collapses the supposedly "indirect," objective *McDonnell Douglas* method of proof with the more subjective direct method. In sum, we wonder what purpose the already formalistic *McDonnell Douglas* doctrinal structure retains in the *Williams* approach.

In contrast, the second approach retains the "special virtue of the [*McDon-*

5. This fourth element differs from that normally used in the Seventh Circuit, where relative disadvantage does not enter into the usual *prima facie* case. *See LaMontagne,* 750 F.2d at 1409; *see also Smith, supra* at n. 4, 502 F.Supp. at 101–02.

*nell Douglas* ] indirect method of proof," that is, allowing "victims of age discrimination to prevail without presenting *any* evidence that age was a determining factor in the employer's motivation." *LaMontagne,* 750 F.2d at 1409–10.[6] True, the *prima facie* case becomes fairly easy to prove in this context, *see Coburn,* 711 F.2d at 343, but it is also easily rebutted by the employer in the reduction-in-force context. In the final analysis, it might be said that the approaches in the two lines of cases are not very different, since proof in the second line that an older worker was "disadvantaged in favor of a younger one" really amounts to a piece of evidence required by the first line that "defendant regarded age as a negative factor" in his consideration. But to the extent, if at all, *Williams* requires more evidence of discrimination in the *prima facie* case, we reject it in favor of the more straightforward second approach. Thus, the *McDonnell Douglas* formula as tailored to this reduction-in-force case is as follows: the plaintiff must prove that (1) he was in the protected class; (2) he was doing his job well enough to meet his employer's legitimate expectations; (3) he was discharged despite the adequacy of his job performance; and (4) he was treated less favorably than younger persons as part of the reduction-in-force. *See Coburn,* 711 F.2d at 342–43; *Massarsky,* 706 F.2d at 118; *cf. Parker,* 741 F.2d at 979 (appearing to require only these four elements in plaintiff's *prima facie* case). Implicit in this fourth element is a requirement (which Oxman himself recognized in his formulation) that some other positions be available at the time of the discharge for which plaintiff is qualified. Although none of the three cases cited above mentioned such a requirement, it was present in each of those cases. *Williams* does create such a requirement, 656 F.2d at 129, and we agree with that Court to that extent.[7]

## PRIMA FACIE CASE

Turning to the facts of this case, we observe at the outset that even this renovated formula does not apply easily here. Just as this is not a typical termination case, it is not a "reduction-in-force" case in the same sense as the ones cited above. There a group of jobs, sometimes quite large, was reduced at once, and the unlucky employees scrambled for the remaining positions. Employers were charged with age discrimination in choosing which employees would fill the remaining positions. In contrast, Oxman's position was the only one eliminated at that one point in time. As we will detail below, WLS–TV did eliminate other positions over time in different ways, but this case is still, in one sense, a "reduction-in-force of one." As such, it is not quite as easy here as in the other cases to determine whether Oxman was treated less favorably than younger employees. We must approach the situation as a whole with common sense, and not be tripped by any verbal traps set by too rigid a reading of the *McDonnell Douglas* formula.

WLS–TV adopts such a rigid approach. It argues that since Oxman's was the *only* job eliminated from the Northwest Bureau, he cannot prove he was treated less favorably than other similarly situated employ-

6. The Court in *LaMontagne* went on to emphasize that the purpose of the *McDonnell Douglas* method is to help the plaintiff overcome the formidable evidentiary difficulties of proving discrimination:

> Even an employer who knowingly discriminates on the basis of age may leave no written records revealing the forbidden motive and may communicate it orally to no one. When evidence is in existence, it is likely to be under the control of the employer, and the plaintiff may not succeed in turning it up. The indirect method compensates for these evidentiary difficulties by permitting the plaintiff to prove his case by eliminating all lawful motivations, instead of proving directly an unlawful motivation.

*Id.* at 1410.

7. In creating such a requirement, we caution that it must not be applied mechanically. Employers might be tempted to dress up an unlawful termination as a "job elimination." Common sense rather than rigidity must always inform a Court's application of the *McDonnell Douglas* formula.

ees. This focus is too narrow. By WLS–TV's restrictive definition, *there are* no similarly situated employees.[8] The reduction-in-force happened elsewhere in the newsroom over time, as WLS–TV itself acknowledges. There is, therefore, a wider frame of reference for us to determine whether Oxman was relatively disadvantaged.

The most striking fact supporting Oxman with respect to the fourth element is that he, the oldest newsroom employee, was fired when his job was eliminated, while many whose jobs were to be eliminated were not. By Swanson's own admission, his usual way to eliminate jobs was to use a hiring freeze and not fill vacancies as they arose. "In this manner, seventeen positions ... were eliminated from WLS–TV's 1984 budget." Swanson Affidavit, ¶ 4. Viewing the *whole* reduction-in-force scheme in the light most favorable to Oxman, this evidence supports his claim that he was treated less favorably than younger employees. That WLS–TV had some purported reasons for treating Oxman differently does not diminish his *prima facie* case, but rather supports its burden of rebutting this case.

WLS–TV also argues that Oxman cannot prove the fourth element because no positions were available at the time of his discharge for which he was qualified. Oxman lists ten vacancies which existed near the time of his discharge, which he claims he was qualified to fill and for which WLS–TV hired people outside the station. He lists five other positions which were filled with station veterans. These fifteen positions opened up at various times ranging from September, 1983 through September, 1984. WLS–TV argues that we should consider only positions open on the date of Oxman's discharge in January, 1984. While we agree with WLS–TV that Oxman's focus may be too broad, as we have observed WLS–TV's is too narrow. A focus on the precise date of discharge would allow for easy manipulation of an official firing date to mask liability. We need not decide now exactly what range of dates is proper to consider in this case. Even if we eliminate positions which were filled before Oxman was officially fired,[9] and consider only those positions vacant at or shortly after the time of Oxman's discharge, a factfinder could reasonably find that several positions existed: two newswriter vacancies and a "Manager of Scheduling" job. WLS–TV admits that Oxman was qualified to be considered for the Manager job.[10] As for the two newswriter jobs, although Oxman had not written news in many years, his 13½ years of writing experience at WBBM–TV preceding his sojourn at WLS–TV, as well as his masters degree in Journalism from the Medill School of Journalism at Northwestern University, might allow a factfinder to find him sufficiently

8. WLS–TV's emphasis on Oxman's unique position hurts its case at least as much as it helps it. While WLS–TV might very well have had good reason for eliminating Oxman's position, *see* p. 1393 below, one wonders why Oxman alone was fired while others whose jobs were eliminated were not. This fact might or might not be significant, but we leave that weighing process to the factfinder.

9. *See Smith v. World Book Childcraft Intern, Inc.*, 502 F.Supp. 96, 99 (N.D.Ill.1980) (Aspen, J.) (granting summary judgment to employer where relevant job position was filled before employee requested transfer). We need not decide whether the *Smith* situation applies here. Oxman argues that it is proper to consider the earlier dates because WLS–TV surely knew before January that it was going to close the Northwest Bureau and that Oxman would want to continue working in another position. He also underscores the potential for employer abuse by manipulation of official termination dates.

10. WLS–TV argues, however, that the position was not really "available" at the time of discharge. We disagree that no genuine issue exists about that fact. WLS–TV admits that it proposed the position to ABC on February 14, 1984, only two weeks after Oxman's termination, and it had considered creating the position before his termination. The finder of fact could reasonably infer that WLS–TV's decision to request the position did not spontaneously erupt on February 14, but was made by the time of Oxman's termination. Although it was not "available" until later in the sense that it required network approval, it was "available" in the sense that it could have been filled pending approval.

qualified to write TV news. To prove his *prima facie* case Oxman need only show that he was qualified, not the most qualified. *See, e.g., Herman v. National Broadcasting Co.,* 744 F.2d 604, 608 (7th Cir.1984), *cert. denied.* — U.S. —, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). Relative qualifications and other exigencies should be dealt with in the employer's rebuttal of the *prima facie* case.

While WLS–TV has been unable to sustain its burden of proving that no factual issues exist with respect to Oxman's *prima facie* case, neither has Oxman shown that he deserves summary judgment. While strong enough to survive WLS–TV's summary judgment motion, the evidence showing he was less favorably treated than other, younger employees is not compelling and does not satisfy the standards of Rule 56. We disagree with Oxman's repeated contention that age discrimination is the "only" reasonable inference to be drawn from all the evidence. As such, we must deny his cross-motion for summary judgment.[11]

## REBUTTAL OF THE PRIMA FACIE CASE

Assuming Oxman can prove his *prima facie* case, WLS–TV has easily articulated several legitimate reasons for its discharge of Oxman, thus satisfying its shifted burden of production. We need only mention a few. Much credible evidence supports its assertion that it closed the Northwest Bureau to cut costs. While the news crew was still needed, a separate manager was not. Thus, while some of Oxman's responsibilities must have shifted to others, his full job position had become superfluous. Since the Northwest Bureau was the only one of its kind, its closing arguably explains why Oxman alone was fired: the Bureau was unique, his position was unique, and so his firing was unique and legitimate when the Bureau was closed. Also WLS–TV has presented evidence that in October, 1983 two other employees—aged 26 and 32—of WLS–TV's "Satellite News Channel" were fired after the sale of that Channel terminated their positions. This analogous firing of younger employees also shows that Oxman's firing was not unique, argues WLS–TV. As for WLS–TV's failure to place Oxman in other vacant positions, it has articulated several plausible reasons for not doing so. Several vacancies were filled before Oxman was fired. Other evidence suggests either that Oxman was not the best "applicant" for the other positions, or that other legitimate reasons existed for not placing Oxman.[12] Given these articulations, the burden shifts back to Oxman to prove that WLS–TV's purported reasons are pretextual.

## PRETEXT

Even though Oxman has created a triable *prima facie* case, WLS–TV's successful rebuttal means that summary judgment in its favor can be appropriate unless Oxman produces some credible evidence on the issue of pretext. *See, e.g., Parker v. Federal National Mortgage Ass'n.,* 741 F.2d at 980; *Selsor v. Callaghan,* 609 F.Supp. 1003 (N.D.Ill.1985) (Aspen, J.) (granting summary judgment to employer in ADEA suit). As noted above, Oxman must produce evidence that discriminatory reasons more likely motivated WLS–TV or that its proffered explanations are unworthy of credence. *LaMontagne,* 750 F.2d at 1409. Oxman has produced both types of evidence. We therefore conclude that WLS–TV has not carried its burden under Rule 56 of showing that Oxman cannot satisfy *his* burden of proving pretext.

11. Even if Oxman had more conclusively established his *prima facie* case, he would not be entitled to summary judgment. As discussed below, WLS–TV has rebutted that *prima facie* case. And while we hold below that Oxman has created a factual issue on "pretext," he has by no means shown that there is no genuine issue of fact running in *his* favor on pretext.

12. For example, one of the two newswriter positions we mentioned was specifically held for new anchor John Drury's personal writer.

Oxman's most direct and strongest evidence is the statement he says Applegate made to him on January 10, 1984. Applegate has not to our knowledge denied making this statement, although such a denial would not be important for summary judgment purposes. Oxman recalls Applegate saying that:

> the business had grown very complex in recent years and that producers were under great pressure. He said that if he made me a producer on one of the shows, they'd know within a week that they'd find me unable to do the job and that I would then still be out of a job. Applegate denied my suggestion that age was a factor in the decision.

Although speaking about a producer rather than newswriter position (the latter of which was then available), Applegate's statement creates a reasonable inference that he believed that Oxman could no longer handle the fast paced TV news business in general because Oxman was old. The ADEA was passed to combat this sort of attitude that older employees are slower-witted, behind the times, or otherwise not "with it." Where, as here, an employer's motive and intent are reasonably brought in issue by a piece of credible evidence, summary judgment is improper. *See Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1218 (7th Cir.1980) (*per curiam*) (summary judgment not proper in discrimination case involving conflicting indications of motive and intent). Oxman need not prove that age "was the only factor motivating the discharge; it need only be a determining factor among others." *LaMontagne,* 750 F.2d at 1414. Viewing Applegate's statement in the light most favorable to Oxman, we conclude that it reasonably implies that age was "a determining factor among others" in Oxman's discharge.[13] It is true, as WLS-TV argues, that this inference is not inevitable and Applegate's statement could have been benign. For that reason, among others, we also deny Oxman's motion for summary judgment. But the inference is reasonable and should be left for the trier of fact to consider in light of all of the evidence, which includes Oxman's long and admittedly capable journalistic past.

While Applegate's statement creates a triable issue of pretext, we observe that other pieces of circumstantial evidence, each benign in isolation, when considered together and with the Applegate statement may undermine the credibility of WLS-TV's articulated reasons for Oxman's discharge. First, Swanson's "hiring freeze" was not absolute, but rather was subject to considerable discretion. While he eliminated seventeen positions after they became vacant, he also hired some fifteen people—aged 24 to 44—including several from within WLS-TV, to fill other vacancies between September, 1983 and September, 1984. Thus, Swanson's cost-cutting was highly selective and seems to have hit Oxman harder than other, younger employees. Second, as for WLS-TV's argument that two other employees were not rehired when their positions were eliminated, *see* p. 18 above, those employees were not *newsroom* employees. WLS-TV has admitted that since January 1, 1981 Oxman has been the only employee among reporters, writer-producers or newsroom management fired because of station reorganization or the closing of a department, bureau or other subdivision. Thus, despite WLS-TV's admitted four million dollar deficit and its desire to cut costs, Oxman stands alone as the only qualified newsroom employee terminated because of reorganization. This might be because Oxman's position was unique, as WLS-TV claims, rather than because of his age, as Oxman argues.

13. Oxman also states that Applegate spontaneously mentioned that he would not be bound by past practice in his treatment of Oxman. Supplemental Affidavit of Jonah Oxman, ¶ 4. This buttresses evidence introduced by Oxman that he was treated differently than other, younger employees, especially since Beverly Kennedy was allowed to transfer into a newswriter position. While WLS-TV plausibly argues that she is a "special circumstance," we think that there is enough evidence on this issue to get to the factfinder.

These and other facts[14] in the record satisfy the court that a genuine issue of fact exists as to pretext, thus precluding summary judgment for WLS–TV. Although WLS–TV has presented its case quite well and forcefully, at this stage we are constrained to look at the case in the light most favorable to Oxman. From such a perspective, we cannot now say that WLS–TV has satisfied its burden under Rule 56, since in the final analysis the case will turn on the motives and credibility of its main actors.

---

**14.** For example, after hearing all of the evidence, the trier of fact might find unpersuasive WLS–TV's articulated reasons for not placing Oxman in the newswriter position formerly occupied by Bill Berra. The person ultimately hired, Edward Epstein, was transferring from a newspaper. Thus, WLS–TV's claim that he was "uniquely qualified and clearly superior to Ox- man" arguably sounds phony in light of Oxman's long experience in electronic media. Before hiring Epstein, WLS–TV had filled the position with 24 year old Mark LaMet, a vacation relief newswriter. This, it claims, is in accordance with station policy. Yet there is evidence that LaMet had little newswriting experience, certainly far less than Oxman.