**Edward A. LANGSTON and Billy J. Simmons, Plaintiffs,**

v.

**CARRAWAY METHODIST HOSPITALS OF ALABAMA, INC., Defendants.**

No. CV–92–N–2176–S.

United States District Court, N.D. Alabama, S.D.

Nov. 1, 1993.

Joe R. Whatley, Jr., Michael K.K. Choy, Cooper Mitch Crawford Kuykendall & Whatley, Larry R. Mann, Birmingham, AL, for plaintiffs.

William F. Gardner, R. Taylor Abbot, Jr., Cabaniss Johnston Gardner Dumas & O'Neal, Birmingham, AL, for defendants.

Memorandum of Opinion

EDWIN L. NELSON, District Judge.

In this civil action, brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq.*, (the "ADEA"), plaintiffs Edward A. Langston (Langston) and Billy J. Simmons (Simmons), claim that they were discharged from their employment because of their age. Defendant Carraway Methodist Hospitals of Alabama, Inc. ("Carraway") denies that the plaintiffs were discharged because of their age and, instead, says their positions were eliminated as a part of a reduction-in-force (RIF). The matter is now before the court on motion of the defendant for summary judgment. The motion has been briefed and was submitted for decision at the court's regularly scheduled motion docket on October 29, 1993. The defendant's motion will be granted and the claims will be dismissed.

### I. The Facts.

The facts here are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions and the court's own examination of the evidentiary record.[1]

---

1. In response to the defendant's statement of facts claimed to be undisputed, the plaintiffs have, in many cases, declined to either affirm or deny certain facts, stating instead in conclusory terms that they require additional discovery before responding. This response is disingenuous. On February 25, 1993, the court conducted a Rule 16(b) conference for the purpose, *inter alia,* of establishing a schedule for the completion of discovery and a deadline for the submission of dispositive motions. An order entered following that conference provided that discovery was to be completed by September 1, 1993. Dispositive motions were due on the same date. In other words, from the date of the defendant's answer on October 6, 1992, the plaintiffs had almost eleven months to conduct discovery.

The plaintiffs Langston and Simmons were terminated from their employment with the defendant Carraway on January 31, 1992 as a part of a RIF.[2] At the time of his termination, Mr. Simmons held the position of Director of the Central Services Department (Simmons depo., p. 13) and also exercised top supervisory functions in the patient transportation department. (*Id.*, pp. 13–16) His duties included management of receiving, preparation, sterilization and issuing of supplies and equipment needed for patient care as well as supervision of patient transportation throughout the hospital.[3] In the Central Services Department, Mr. Simmons supervised 18 employees who all answered directly to him. (*Id.*, pp. 30–31) Those employees held titles of Technician, Control Clerk and Rental Clerk. (*Id.*, p. 31)

As of January 1, 1992, plaintiff Simmons supervised approximately 20 employees in the Transportation Department. (*Id.*, p. 30) Of the 20 employees in that department, one held the title of Assistant Supervisor, and another held the title of Shift Leader. (*Id.*,

pp. 33–34) Helen Gober, who was age 55 in January, 1982, was the Assistant Supervisor. (*Id.*, p. 31; Jones affidavit, ¶ 7) All other employees in the Transportation Department were designated as Transportation Attendants. (Simmons depo., p. 34)

At the time he was terminated, Mr. Simmons was supervised by Mike Sheffield who held the title of Administrative Assistant. Mr. Sheffield was then 38 years of age. (Sheffield depo., pp. 5, 10; Simmons depo., p. 41)

Plaintiff Langston, at the time he was terminated, held the positions of Technical Director of Nuclear Medicine and Technical Director of Radiation Oncology. (Langston depo., p 25) Like his co-plaintiff Simmons, Langston worked under the supervision of Assistant Administrator Mike Sheffield. (*Id.*, p. 87) This plaintiff supervised four employees in the Nuclear Medicine Department. (*Id.*, p. 78) They held the titles of Nuclear Medicine Technologist, one employee, Nuclear Technician, one employee, Con-

---

On August 25, 1993, seven days before the discovery cutoff, the plaintiffs moved the court for an extension of the discovery cutoff to November 1, 1993, in order to engage in additional discovery, the need for which was said to be based upon the deposition testimony of the defendant's Rule 30(b)(6) witness. The court notes that the depositions of Cindy Williams and Mike Sheffield, presumably the defendant's Rule 30(b)(6) witnesses, were not taken until August 24, 1993.

In an order denying the motion to extend discovery the court stated, "[T]he plaintiffs have not shown that they have diligently pursued discovery since entry of the scheduling order. Neither have they demonstrated any other good cause for delaying the discovery or dispositive motions deadline[s]." The motion for summary judgment was filed at 4:40 p.m. on September 1, 1993. On September 23, 1993, the plaintiffs moved the court for permission to conduct additional discovery, asserting they were unable to respond to certain matters asserted by the defendant.

In the opinion of the court, the plaintiffs have been afforded a full, fair and complete opportunity to conduct discovery. The fact that they may not have done so, on the record before the court, can be attributed only to their own want of diligence. The court will not permit the plaintiffs to delay this matter further by now engaging in discovery that they should have done during the period set aside for that purpose.

2. The plaintiffs deny that their separation was a part of RIF. Neither party has cited the evidentiary record to support their respective positions.

That failure, at least on the part of the plaintiffs, is entirely understandable, given the fact that the record submitted to the court is replete with evidence that these plaintiffs and nine other employees were terminated on the same day following an extensive evaluation of the defendant's management structure and hospital operations done at the highest levels of management.

"[T]he essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired." *Early v. Champion Intern. Corp,* 907 F.2d 1077, 1083 (11th Cir.1990) (*quoting, Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1220 (3rd Cir.1988)). The evidentiary record here admits of no reasonable conclusion, other than that the defendant terminated the plaintiffs as a part of a RIF and the court will evaluate the claims in that context.

3. Mr. Simmons' supervisor, Mike Sheffield, described the plaintiff's duties as the Director of Central Services, "He was responsible for establishing the policies and procedures in the department, staffing the department, hiring and disciplining employees, establishing the goals and directions for the department, interacting with other department heads, interacting with physicians about types of supplies necessary, ordering of supplies; the general day-to-day running of the department." He was also responsible for "developing the budget for the department and ensuring that the department was managed within the budget." (Sheffield depo., pp. 29–30)

trol Clerk, one employee, and Assistant Director, one employee. (*Id.*, p. 78) The Assistant Director was Larry Harris, who was age 41 in January, 1992. (*Id.*, p. 78; Jones affidavit, ¶ 7)

Mr. Langston's duties in the Nuclear Medicine Department encompassed both clinical, direct patient care, and administrative functions. (*Id.*, pp. 91–92) In some ways he performed duties similar to those of Technologists and Technicians in that he provided direct care to patients. (*Id.*, p. 91) His administrative duties in that department included responsibility for payroll, personnel functions, budgeting, purchasing, equipment maintenance and quality assurance and control. (*Id.*, p. 92)

With respect to the Oncology Department, Mr. Langston's job duties also included both clinical and administrative functions. (*Id.*, p. 109) Under his supervision were five employees including technologists, two nurses and a receptionist-clerk. (*Id.*, pp. 78–79) Marsha Crane, age 45, was the Supervisor of the department. (*Id.*, p. 81; Jones affidavit, ¶ 7) In addition to his direct patient care duties in Radiation Oncology (*Id.*, pp. 109–110), Mr. Langston performed administrative duties consisting of payroll, personnel, purchasing, budgeting, invoicing, maintenance and quality assurance and control. (*Id.*, pp. 109, 112–117)

Until the time they were terminated as a part of the RIF, neither plaintiff had any complaint about the way they had been treated at Carraway. (Simmons depo., pp. 13–16; Langston depo., p. 87)

At some point in time before the plaintiffs' positions were eliminated, the defendant undertook to evaluate its operations with a view to streamlining and making more efficient its delivery of services to its "customers." Mr. Sheffield testified in deposition:

> The purpose of the reorganization was to help us reduce costs, to help us bring the size of our management structure in line with our current volume of business, to help be more efficient in our daily operations within the hospital. We had had layoffs in the past—or excuse me, reduc-

tions in force in the past with staff employees and we had reduced our level of staff. Our volume of business had gone down from five hundred and fifty patients a day to a little under three hundred patients a day. We had reduced our staff accordingly. We had not adjusted our management hierarchy.

(Sheffield depo., pp. 36–37) Ms. Williams testified,

> The goal was to position ourselves to respond to the changes in our health care industry to become more efficient, we needed to improve our efficiency. We had been experiencing a decline in our in-patient census and the need was to flatten the organization to become more responsive and efficient.

(Williams depo., pp. 54–55)

The original recommendations that eventually resulted in the elimination of the plaintiffs' positions came from two different sources. Mike Sheffield recommended that the Central Services and Transportation Departments be merged into and placed under the supervision of the Pharmacy Department, eliminating the position then held by plaintiff Simmons. (Sheffield depo., pp. 25–26) The recommendation to eliminate the position of Director of Nuclear Medicine and Radiation Oncology and merge those functions with the Department of Radiology came from charts of the new organizational structure provided to the reorganization committee by the Carraway hospital administrator, James Hallmark. (*Id.*, pp. 62–64, 65; Williams depo., pp. 18–20, 28–31)[4]

Recommendations regarding the reorganization were considered and discussed by a committee which consisted of eight Carraway administrators. (Williams depo., p. 17) The members of the committee and their ages as of January 31, 1992 were:

| | |
|---|---|
| Dr. Ben Carraway | 82 |
| James B. Hallmark | 59 |
| Ann Sorge | 72 |
| Butch Rowell | 47 |
| Cindy Williams | 39 |
| Mike Sheffield | 38 |
| Tim Thornton | 41 |
| Mickey Jones | 44 |

---

**4.** Though the plaintiffs have disputed this fact, which is claimed to be undisputed by the defendant, there is no significant irreconcilable differ-

ence between the testimony of Cindy Williams, relied upon by the defendant, and Mike Sheffield, relied upon by the plaintiffs.

(Jones affidavit, ¶¶ 1, 3; Williams depo., pp. 17, 33–34, 36–38) Final decisions as to which positions would be eliminated were made by Dr. Ben Carraway, Chairman of the Board and Chief Executive Officer, and James Hallmark, the Hospital Administrator. (Jones affidavit, ¶ 2) [5]

Mr. Sheffield stated that he recommended that Central Supply and Transportation be merged into the Pharmacy Department because, "[t]he functions of the two departments were similar, the interaction with the physicians and the nurses were similar, they're physically located together.... Administratively, it was—the best department to merge central and transportation with was the pharmacy department." (Sheffield depo., p. 43)

Prior to January 1992, Carraway had had one or more reductions-in-force which had affected only non-managerial employees. (Id., pp. 36–37) Subsequent to the events in question here, the defendant had another RIF, affecting non-managerial employees in July 1993. (Id., p. 38) Only the positions of managerial employees were affected by the January 1992 reorganization. (Id., p. 37)

As a part of the reorganization, the Central Services Department and Transportation Department were merged into the Pharmacy Department. (Id., p. 30) Both the plaintiffs' positions were eliminated and their former duties were dispersed to employees in the departments into which their former departments were merged. (Id., p. 30; Williams depo., pp. 57–58) [6] Tom Alford, a registered pharmacist, with a master's degree, and Director of the Pharmacy Department before the reorganization, (Sheffield depo., pp. 30–31) was chosen to head the new Pharmacy Department, which included the former duties of the newly merged Central Services and Transportation departments. (Id., pp. 30, 47–49) The plaintiffs have disputed the correctness of defendant's statement of fact number 26, upon which this statement is based.[7] In doing so, they have again cited

5. Presumably, Mr. Hallmark is the individual referred to by the plaintiffs in their motion for an extension of the discovery deadline, filed one day after taking the deposition of Cindy Williams. See, Williams deposition at pages 30, 34 and 36. Obviously, the plaintiffs would have known about Mr. Hallmark months before if they had but proceeded with discovery before the deadline was upon them.

6. This statement comes from the defendant's proposed undisputed fact number 23. The plaintiffs' response provides an interesting, and perhaps telling, illustration of counsel's somewhat indifferent approach to his duty to comply with the court's summary judgment procedure. Exhibit D, which was attached to and made a part of the Rule 16(b) scheduling order required the plaintiff to respond to the defendant's statement of proposed undisputed facts by either admitting, denying or offering a brief explanation such as, "Admitted but not material." The order then provided, "Any facts which are disputed shall contain a specific reference to the evidentiary record."

In their response to the defendant's number 23, the plaintiffs said, "Disputed. (Tabs 1, 4, 5, 6, 7, 8, 9, 11, 12, 13) (Williams depo. pp. 55–57)." With the exception of the reference to the Williams deposition, the cited "specific" references to the evidentiary record are:

Tab 1. The five-page affidavit of Mr. Langston.
Tab 4. The personnel file of Kenneth James Dover consisting of a ⅜ inch thick file of documents.

Tab 5. Answer to plaintiffs' interrogatory. It does not contradict the defendant's statement number 22.
Tab 6. Personnel file of Larry Chester Harris, approximately ⅜ inch thick.
Tab 7. Personnel file of Marsha Shanklin Fagan, approximately ½ inch thick.
Tab 8. Personnel file Edward A. Langston, approximately ⅜ inch thick.
Tab 9. Five-page affidavit of Billy Simmons.
Tab 11. Personnel file of Judy Vaughn, approximately ½ inch thick.
Tab 12. Personnel file of Marsalis, approximately ½ inch thick.
Tab 13. Personnel file of Billy Simmons, almost ½ inch thick.

Counsel did not deign to even leave the court a hint, and certainly did not draw it a map, so that it might begin its journey through this mass of papers with some humble thought about what it might be searching for.

7. The relevant portions of the deposition of Mike Sheffield, cited by the defendant, are:

Q. Did anyone replace Billy Simmons?
A. We merged that department with the pharmacy department.
Q. Okay.
A. I asked the director of pharmacy to assume those duties.
Q. Who is the director of the pharmacy?
A. Tom Alford, A–L–F–O–R–D.
Q. Did Mr. Alford assume all of the duties that Mr. Simmons had prior to his discharge?

the court to the entire personnel files of Vaughn, Marsalis and Simmons and have once again withheld any suggestion about what is in them that is relevant to the issues here. Where they have cited specific parts of the record, those citations do not support the position taken.

At Tab 5 of the plaintiffs' submission are certain interrogatory answers given by the defendant. To questions concerning who "replaced" Mr. Simmons, the defendant said, "No employee replaced Billy Simmons.... The job functions performed by Billy Simmons, to the extent they continued to exist after the reorganization, were performed by Tom Alford, DOB 9–19–47, Director of Pharmacy."

In his affidavit, at paragraphs 4 and 5 (Tab 9) Mr. Simmons asserts that Judy Vaughn and Ken Marsalis replaced him because their personnel files show that "Judy Vaughn is performing virtually all of the functions I performed immediately prior to my discharge" and "Marsalis assumed some of my other duties."

The court has itself searched the Vaughn and Marsalis personnel files and found material that may be relevant. In the Vaughn file is a document entitled, "Carraway Methodist Medical Center, Performance Management System" which appears to be an evaluation form for Ms. Vaughn. It is dated February 23, 1993 and shows that, as of that date, she was listed as a "supervisor" and was performing services related to procurement of supplies, sterilization of equipment, coordination of staffing and proper billing. Her supervisor, Tom Alford, Manager, Pharmacy & Central," added a note to the evaluation, "Judy has done an excellent job with her *new duties*." (Emphasis supplied)

The court has found two evaluations for Mr. Marsalis that are dated after the termination of Mr. Simmons. The first, dated April 6, 1992, contains but a single reference which the court can identify as related to the

duties formerly performed by Simmons. Under a handwritten section entitled "Goals 1992–1993" is the note, "Assist in the day to day management of Central Supply and Transportation." An evaluation dated February 23, 1993, lists Marsalis as "Assistant Director of Pharmacy" and recites that he "Supervises personnel in the Dispensing portion of Pharmacy and Central Supply to insure proper function." Tom Alford, Director of Pharmacy, noted that "Larry continues to do an exceptional job managing Pharmacy and Central Supply."

Mr. Sheffield testified that Judy Vaughn assumed some duties similar to those previously performed by Mr. Simmons several months after the plaintiffs' termination.

A. At some point six, seven, eight months later, Tom Alford told me he needed someone in that department to handle some daily duties like staffing, making sure that when the work is finished in one area, if he's not physically there, someone can say go do the work over in this area. And so Judy got some additional responsibilities at that time.

Q. What additional responsibilities did she get?

A. She's like the lead central supply person.

(Sheffield depo., p. 55) He also testified that Vaughn "assists with the staffing, developing the schedules, the hour-by-hour instruction of what work needs to be done and the prioritizing of the daily work, she assists in the interview of employees." (*Id.*, p. 57)

Sheffield also testified that because he was "spearheading" a new automated drug dispensing system, Marsalis is performing some functions formerly done by Simmons. "Because now that pharmacy and central are together, we have purchased the Sure–Med systems and have some pharmacy items and some central supply item in them. There's some interaction between the pharmacy

A. Yes, he did—No. Yes.
Q. Was Billy Simmons considered for any other position other than director of central supply prior to being discharged?
A. No.
Q. Why not?
A. We had no other position.

Q. What are Tom Alford's qualifications?
A. He's a registered pharmacist, has a master's degree, about eight years experience as director of the pharmacy department at Carraway.
(Sheffield depo., pp. 30–31) Pages 47 through 49 likewise support the defendant's statement.

techs and the central supply techs. Larry may have some involvement with those central supply items in that Sure–Med system." (*Id.,* p. 59)

The plaintiff Simmons was not qualified to hold the position held by Tom Alford following the reorganization. (Sheffield depo., pp. 42–43) In his affidavit, Mr. Simmons asserts that Tom Alford had no experience in "Central Supply or Transportation," the functions of which could not be eliminated in the operation of the hospital. (Simmons affidavit, ¶¶ 5, 10) He states, "I was the most experienced employee and most qualified to be Director of Central Supply/Transportation, and Tom Alford was not. (*Id.,* ¶ 10) Alabama law requires that the Pharmacy Department, which included Central Supply and Transportation after the reorganization, be headed by a registered pharmacist. Mr. Simmons was not a registered pharmacist. (Sheffield depo., pp. 42–43)

As a part of the reorganization, the Nuclear Medicine Department was merged with the Department of Radiology to form a new department known as the Imaging Services Department. (Williams depo. p. 57) Prior to the reorganization, the Department of Radiology, which included both X-ray and non-X-ray functions such as MRI, Cat-scan and Ultrasound, (*Id.,* p. 67) was headed by Ken Dover, (*Id.*) who was 33 years old in January 1992. (Jones affidavit, ¶ 7) Mr. Langston was not qualified as was Ken Dover to be Director of the new Department of Imaging Services because the position required "a broader base of knowledge in all aspects of imaging ... radiology ... MRI, CAT scan, vascular lab." Mr. Dover had the required knowledge and Mr. Langston did not. (Williams depo. p. 63) Additionally, the new department had a larger employment group requiring supervision than did Mr. Langston's prior position. (*Id.,* p. 64)

Following the reorganization, Mr. Langston's clinical Nuclear Medicine functions were performed by the remainder of the Nuclear Medicine staff, and particularly by Supervisor Harris. (Langston depo., p. 122). His administrative duties in the Nuclear Medicine Department were assumed by Ken Dover, the new Director of Imaging Services.

(Langston depo., p. 124; Williams depo., pp. 69–71; Carraway's proposed undisputed fact, 42)

Mr. Langston asserts that he was qualified and says, "I am qualified to work at all levels of Nuclear Medicine technology, all levels of Radiation Oncology technology, and I am certified and qualified to do radiation safety, and health physics. In these areas in the hospital there are positions as radiation safety officer, radiological technologist (X-ray technicians). I can perform CT's or MRI's. I can also do ultrasound" (Langston affidavit, ¶ 3) He testified in deposition, that he could perform the duties of nuclear medicine technologists, radiation oncology technologists, radiation safety and health physics, ultrasound and CAT scan and MRI technicians. (Langston depo., pp 177–178)

In the Carraway reorganization, the Radiation Oncology Department was merged into the Cancer Center to form a new Department of Oncology Services. (Williams depo., pp. 58–59, 68–71) Martha Fagan was Director of the Cancer Center (*Id.,* pp. 70–71) and became Director of Oncology Services, after the reorganization. (*Id.,* p. 71) Mr. Langston's former clinical functions in the Radiation Oncology department were dispersed among the employees he formerly supervised, primarily to Marsha Crane. (Langston depo., pp. 127, 129; Williams depo. p. 69; Carraway proposed undisputed fact, 43) Ms. Fagan was qualified to be director of the new department and Mr. Langston was not because, "Ed Langston ... did not have any prior experience related to the management of an out-patient cancer center and physician practice. Also, [he] ... was not a registered nurse, and the position of director of oncology services is a position which a registered nurse holds." (Williams depo., p. 61) There is no legal requirement that the position be held by a registered nurse (*Id.,* p. 61–62) but it is "preferred" by Carraway and by its medical director of oncology. (*Id.,* p 62) The hospital's director of oncology services has been a registered nurse since 1990, more than one year before Mr. Langston's position was eliminated. (*Id.,* p. 69). Mr. Langston disputes the contention that he was not qualified, as was Ms.

Fagan, to be Director of the Department of Oncology Services but his opinion, stated in his affidavit, is just that, his opinion. (Langston affidavit, ¶ 6)

All of the Carraway employees who assumed duties formerly performed by either of these two plaintiffs were younger than were they. Some such persons were over the age of 40 and some were under.

Assistant Administrator Mike Sheffield informed both Simmons and Langston on January 31, 1992, that they were being terminated. (Simmons depo, p. 56; Langston depo. p. 151) · Nothing was said during either meeting on the subject of age. (Simmons depo., pp. 56–58; Langston depo., pp. 152–156) Mr. Simmons later talked to hospital Administrator James Hallmark to confirm that he was being terminated. (Simmons depo., p. 61). Again, nothing was said regarding age as a factor in his termination. (*Id.*, pp. 61–62) Both Simmons and Langston were 57 years of age when they were terminated. (Simmons affidavit, ¶ 6; Langston affidavit, ¶ 7) Langston was the oldest employee in the Department of Nuclear Medicine and Radiation Oncology. Simmons was the second oldest employee in the Department of Central Services. (Plaintiff's proposed undisputed fact, 57) Each of the eleven persons who were terminated on January 31, 1992, were over the age of 40. (Plaintiffs' proposed undisputed fact, 51)

There were no vacancies during February and March 1992 in any of the positions Mr. Simmons believed he was qualified to fill. (Simmons depo., p. 76; Jones affidavit, ¶ 6; Sheffield depo., p. 30, 36, 42) Likewise with Mr. Langston, there were no vacancies in February and March 1992 in any position in any of the departments he had supervised prior to his termination. (Jones affidavit, ¶ 6; Williams depo., pp. 73–74) [8]

Following their terminations, both plaintiffs received letters from Carraway inviting them to telephone the Carraway "job line" for information on any open positions for which they might be interested in applying. (Simmons depo., p. 121, Exh. 3; Langston depo., p. 230, Exh. 5). Each plaintiff telephoned once but neither expressed any interest in any of the positions available because there were no open positions for which they were qualified. (Simmons depo., pp. 121, 123; Langston depo., pp. 231–232.)

The plaintiffs have neither direct nor anecdotal evidence to support their claims of age discrimination. (Simmons depo., pp. 146–148) [9] Simmons testified that some unspecified employees he had supervised told him they believed he was discharged because of his age because they could think of no other reason for his termination. (Simmons depo., p. 147). Other than his own employees, no one said anything about age having been a factor in his termination. (*Id.*, pp. 147–148) Mr. Langston testified:

Q. Was there any occasion at the time you were terminated that anyone said anything about your age?

A. No.

Q. After your termination did anyone who was an employee of Carraway say anything about your age?

A. No.

Q. Do you have any information, Mr. Langston, as to anything being said about your age having to do with your termination?

A. No.

Q. Do you know of any existence of anything in writing about age having to do with your termination?

A. No, I don't.

Q. Do you know of anything being said by any managerial or administrative or

---

**8.** The plaintiffs have declined to respond to the factual statements in this paragraph, again asserting the need for additional discovery. As the court as noted earlier, the plaintiffs have been afforded ample discovery. The cited portions of the evidentiary record fully support the statements made.

**9.** The plaintiffs point to rosters of persons terminated on January 31, 1992 and of the department of nuclear medicine and radiology and of central service as of January 1, 1992. (Plaintiff's evidence, Tabs 2, 3 and 10) While these lists may, or may not, be circumstantial evidence, they are neither direct nor anecdotal evidence of discrimination.

supervisory employee about anyone's age?

A. No.

(Langston depo., pp. 209–210) The subject of age was not discussed at any meeting of the reorganization committee (Williams depo., pp. 45–46) and the committee never discussed the ages of the persons whose positions were being eliminated. (*Id.*)

## II. Summary Judgment Standard.

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. at 2552; *see* Fed.R.Civ.P. 56(a) and (b). There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

Once the moving party has met his burden, rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The nonmoving party need not present evidence in a form necessary for admission at trial, however he may not merely rest on his pleadings. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

After a properly made motion has been properly responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2510. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512; *see also Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 2171, 76 L.Ed.2d 277 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts". *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (citations omitted); *accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir.1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at

254, 106 S.Ct. at 2513; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir.1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n. 12 (11th Cir.1988).

## III. Discussion.

■ Though plaintiffs often argue, as do they do here, that summary judgment should be rarely granted in employment discrimination cases, the truth is that summary judgment is not at all rare in such cases. *See, Early v. Champion Intern Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990), and cases cited there. In an employment discrimination case, the plaintiff must first establish a prima facie case of discrimination. If the defendant then produces evidence of a legitimate non-discriminatory reason for the actions it took adverse to the plaintiff, the burden then shifts back to the plaintiff to prove that the reason articulated by the defendant is but a pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### A. The Prima Facie Case.

There are three means by which a plaintiff may seek to establish a prima facie case of age discrimination: by direct evidence of discriminatory intent; by meeting the test originally set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); or by statistical proof of a pattern of discrimination. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir.1989).

### 1. Direct Evidence.

There is no direct evidence of discrimination in this case. "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] *without inference or presumption.*" *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir.1989) (emphasis added). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, ... constitute direct evidence of discrimination." *Carter*, 870 F.2d at 582. The plaintiffs here have presented absolutely no direct evidence on the issue of age discrimination.

### 2. Statistical Evidence.

■ A second means by which the plaintiffs may show a prima facie case is by the presentation of statistical evidence that demonstrate a pattern and practice of age discrimination. *Young v. General Foods Corp.*, 840 F.2d 825 (11th Cir.1988), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). To that end they have shown that each of the eleven persons whose positions were terminated in the RIF of January 31, 1992, was over the age of forty. Such raw figures are seldom useful because they provide no framework for analysis. "Statistics ... without an analytic foundation, are virtually meaningless." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 952 (11th Cir.1991). The RIF in question affected only management personnel. It is not known how many total employees at Carraway were in the total pool of management personnel or what proportions were within and without the protected group. While statistics are often important in class actions and disparate impact cases, they "are of relatively low importance in an individual disparate treatment case." *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1253 n. 8 (7th Cir.1990). As the Eleventh Circuit has said, "statistics alone cannot make a case of individual disparate treatment." *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984). The plaintiffs cannot make out a prima facie case of disparate treatment by the use of raw unadorned figures such as those presented here.

### 3. Circumstantial Evidence.

■ The use of circumstantial evidence to establish a prima facie case requires resort to the *McDonnell Douglas* procedure. In order to make out a prima facie case under that procedure, a plaintiff in an age discrimi-

864

nation case who was terminated in a RIF must demonstrate: (1) he was a member of a protected group who was adversely affected by an employment decision; (2) he was qualified for his former position or another position at the time of the adverse decision; and (3) direct or circumstantial evidence from which a factfinder might reasonably conclude that the employer, in reaching the decision at issue, intended to discriminate on the basis of the plaintiff's age. *Early*, 907 F.2d at 1082; *Verbraeken*, 881 F.2d at 1045–46, citing, *Rollins v. TechSouth*, 833 F.2d 1525, 1532 (11th Cir.1987); *Barnes v. Southwest Forrest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987); *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir. Unit B 1981), cert. denied, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). The Eleventh Circuit has said,

> Where a particular job position is entirely eliminated for nondiscriminatory reasons, for plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer, qualification for his current position is not enough. *Barnes*, 814 F.2d at 609; *Williams*, 656 F.2d at 129; cf. *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n. 2 (11th Cir.1987) (where plaintiff is discharged from previously held position, "prong requiring proof of qualification [for that position] is removed").

*Early*, 907 F.2d at 1082–83.[10] The prima facie case requirement was "never intended to be rigid, mechanistic, or ritualistic." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). On the other hand, "[a] prima facie case may be established only when there is a basis for inferring that discrimination is the reason for the employment decision...." *Pace v. Southern Ry. System*, 701 F.2d 1383, 1390 (11th Cir.), cert. denied, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983).

Without doubt each of the plaintiffs were, at the time their positions were eliminated, within the protected age group and they were adversely affected by the Carraway reorganization which caused them to be terminated from their employment. The defendant does not contend that either Mr. Simmons or Mr. Langston were not qualified for the positions they held prior to the RIF. The evidence seems clear that each of them had performed those duties well. Neither, however, has produced evidence from which a factfinder could conclude that he was qualified to fill any position which was available at the time he was terminated.

■ In the case of Mr. Simmons, his duties included management of receiving, preparation, sterilization and issuing of supplies and equipment needed for patient care as well as supervision of patient transportation throughout the hospital. He was also responsible for a variety of activities associated with the management of hospital departments, including setting of policies and procedures, staffing, hiring and disciplining of employees, inventory, budgeting and interacting with other department heads, upper

10. The plaintiffs urge the court to adopt the more liberal approach to proving a prima facie case in a RIF used by the Third Circuit Court of Appeals in *White v. Westinghouse*, 862 F.2d 56 (3rd Cir. 1988). That, of course, is not possible. It is the law of the Eleventh Circuit that binds this court and, where there is controlling precedent from the circuit, this court is bound to follow it. The Eleventh Circuit law is that which is set out in *Early*. The plaintiff argues that their situation is distinguishable from *Early* because in that case the plaintiff's "position as inventory control supervisor was entirely eliminated in the RIF; most of the work was transferred to a computerized inventory control system." *Early*, 907 F.2d at 1083. This argument is unavailing because, like in Early, the "positions" of Simmons and Langston were "entirely eliminated." Following the reorganization, there was no longer a Di-

rector of Central Services or a Director of Transportation. There was instead a Director of the Pharmacy Department whose responsibilities encompassed those he had before the reorganization plus those previously held by Mr. Simmons. In the case of Mr. Langston, following the reorganization, the positions of positions of Technical Director of Nuclear Medicine and Technical Director of Radiation Oncology no longer existed. In the reorganization, the functions formerly performed by those two departments were merged into and assumed by, respectively, the new Department of Imaging Services and the Cancer Center. Just as in *Early*, the plaintiffs' positions were eliminated. The functions formerly performed by persons holding those positions remained but were performed in a different manner.

management and physicians. See footnote number 3. These are all duties that were merged into and assumed by the Director of the Pharmacy Department, Tom Alford. Under Alabama law, the pharmacy department was required to have a registered pharmacist as its director. Mr. Alford is a registered pharmacist and Mr. Simmons is not. The plaintiff Simmons was not qualified for the position held by Mr. Alford.

Mr. Simmons argues that Judy Vaughn and Ken Marsalis, two younger employees, each assumed some of the duties previously performed by him. The court in *Early* addresses this argument.

"[N]othing in the ADEA requires that younger employees be fired so that employees in the protected age group can be hired." *Barnes,* 814 F.2d at 610. Nor should subsequent job openings (several months after plaintiffs' discharge) be considered as satisfactory proof of an open position at time of termination. *See, e.g. Brownlow v. Edgecomb Metals Co.,* 867 F.2d 960, 964–65 (6th Cir.1989) (reversing trial court verdict for plaintiff in ADEA reduction-in-force case because positions were not established until following year).

*Early,* 907 F.2d at 1083. The defendant was not required to displace Vaughn or Marsalis in order to make a place for Simmons. Further, the only evidence which suggests that Vaughn performed duties formerly done by Simmons is that one year later she was engaged in aiding Alford in the day-to-day management of his department. In the case of Mr. Marsalis, the first indication that he performed some of Mr. Simmons prior duties was dated April 6, 1992, more than two months after the RIF. There, the reference to those duties was under "Goals 1992–1993." In short, there is no evidence that either Ms. Vaughn or Mr. Marsalis assumed any of Mr. Simmons' duties at the time of his termination.

One other observation should be made concerning Ms. Vaughn and Mr. Marsalis. There is no evidence that either of them performed any duties not delegated to them by Mr. Alford. The evidence is clear that Mr. Alford was assigned the functions formerly performed by Mr. Simmons. The fact that he may have chosen to exercise some of his duties by delegating them to Ms. Vaughn or Mr. Marsalis is of no moment. The important consideration is that Mr. Simmons had been assigned the responsibility and that responsibility was transferred to Mr. Alford. At the risk of appearing flippant, it comes down to the sign said to have been on the desk of President Truman, "The Buck Stops Here."

█ Following the reorganization, the Nuclear Medicine Department was merged with the Department of Radiology to form a new Imaging Services Department which was then headed by Ken Dover, who was then 33 years of age. Mr. Langston's administrative duties in the Nuclear Medicine Department were assumed by Mr. Dover. The new position, encompassing the functions and duties of both the departments, required "a broader base of knowledge in all aspects of imaging ... radiology ... MRI, CAT scan, vascular lab." The evidence is that Mr. Dover had the required knowledge and experience and that Mr. Langston did not. The new department management duties also required supervision of a larger employment group than did Mr. Langston's prior position. (*Id.,* p. 64)

Mr. Langston's clinical functions in the Nuclear Medicine Department were performed by the remainder of the Nuclear Medicine staff, and particularly by Supervisor Harris.

The plaintiff's evidence regarding his own qualifications for the position as Director of the Imaging Services Department shows that they are more directed at the clinical aspects of the department. Nowhere does that evidence suggest that he was qualified to assume and perform the broad range of duties required of the director of the department.

The Radiation Oncology Department was merged into the Cancer Center to form a new Department of Oncology Services which was then headed by Martha Fagan. Ms. Fagan had been Director of the Cancer Center and was named Director of Oncology Services, after the reorganization. Mr. Langston's former clinical functions in the Radiation Oncology department were dis-

persed among the employees he formerly supervised, primarily to Marsha Crane. His administrative duties were assumed by Ms. Fagan. The evidence is undisputed that Carraway required that the head of the Cancer Center be a registered nurse and it had done so for more than one year before the RIF. Mr. Langston was not a registered nurse and had no prior experience in running an out-patient cancer center and physician practice. Mr. Langston's opinion that he was qualified is not sufficient to contradict the evidence to the contrary.

■ Finally, there is no evidence from which a factfinder might conclude that Carraway intended to discriminate against either of these plaintiffs on the basis of their age. As noted above, there was no direct or statistical evidence from which to infer that the plaintiffs were terminated because of their age. That Simmons and Langston were, respectively, the second oldest and oldest employees in their departments is of little import when taken in conjunction with the fact that they were the department heads and those departments were eliminated. Obviously, the plaintiffs could not continue to manage departments that no longer existed.

The plaintiffs argue that they were replaced by persons who were younger than they, albeit, some were within the protected age group. It should be noted that the plaintiffs were not replaced. Their duties and job functions were dispersed throughout new departments and allocated to several persons. In any event, it is extremely doubtful that such evidence, in light of all the other facts and circumstances, is probative on the issue of intentional discrimination. As another district court in this circuit has said,

The identity of who assumes duties—or indeed whether the displaced employee's duties are assumed at all—is irrelevant to a consideration of which positions should be eliminated when an employer sees a need to reduce the work force. The traditional prima facie cases suggest discrimination because we can see, objectively, that individuals who are comparable in qualifications and job duties, but who are different in age, gender or race, were treated differently. All other variables are objectively equal except the suspect classification. Thus, when the individuals are treated differently, we can infer that the classification prompted the differential treatment. Persons holding completely distinct administrative positions are not "comparable individuals" and a comparison of the ages of those holding eliminated positions with the ages of those who assumed their duties reveals nothing.

*Myers v. Glynn–Brunswick Memorial Hosp.,* 683 F.Supp. 1387 (S.D.Ga.1988) (Alaimo, J.)

■ Furthermore, the fact that six of eight members of the reorganization committee were within the protected age group coupled with the fact that the two ultimate decision makers were ages 59 and 82, suggests, not that they were likely to discriminate but, in fact, suggests the opposite. Those who are themselves within a protected group are less likely to discriminate that are those outside the group. *Elrod v. Sears, Roebuck and Co.,* 939 F.2d 1466 (11th Cir.1991) (persons inside protected group are more likely to be victims of discrimination than its perpetrators).

In summary, the plaintiffs have each submitted sufficient evidence that they were members of the protected age group and that they were adversely affected by the defendant's decision to eliminate their positions. They have each failed, however, to offer any evidence from which a factfinder could find that they were qualified for another position with the defendant that was available at the time of their termination. They have also failed to offer evidence to support a finding that Carraway intended to discriminate against them. Thus, they have failed to establish a prima facie case of age discrimination.

**B. Defendant's Nondiscriminatory Reason.**

■ The defendant asserts that it terminated the plaintiffs' positions and their employment because of the need to reorganize its operations to account for a diminishing patient census and to make them more efficient. The plaintiffs' evidence on the issue of

pretext is largely identical to that offered on its prima facie case. There is no need to readdress that evidence here. One matter does deserve comment. They claim that in a newspaper article published at about the time of the terminations a Carraway representative stated, "The hospital is not in bad shape, the census is not falling." In fairness, if the news item is to be taken into account, it should be in its entirety. When that is done, its significance insofar as the plaintiffs are concerned is greatly diminished. It tends as much to support the position taken by the defendant as it does to detract from it.[11]

IV. Conclusion.

The cases have cautioned that trial courts should not apply the *McDonnell Douglas* shifting inferences procedure in a rigid mechanistic manner but they have also recognized that a defendant will be entitled to summary judgment when the only inference of age discrimination must be found in speculation and conjecture. Here the plaintiffs have not presented sufficient evidence even to raise an inference that their ages played any role whatsoever in their employer's actions toward them. Accordingly, the defendant's motion for summary judgment is due to be granted. A separate judgment will be entered.

Order Granting Motion for Summary Judgment and Dismissing Action

In accord with the Memorandum of Opinion entered contemporaneously herewith, it is hereby

ORDERED, ADJUDGED and DECREED:

1. The defendants motion for summary judgment is in all respects GRANTED.

2. The action is DISMISSED with prejudice.

3. Costs are taxed against the plaintiffs and in favor of the defendant.

11. The article, in its entirety, was:
11 mid-management jobs eliminated at Carraway

A corporate reorganization resulted in the elimination of 11 mid-management positions late last week at Carraway Methodist Hospital Medical Center.

"This is the result of a two-year study of the management structure of the hospital," said David Smitherman, director of marketing. "We were streamlining the operations of the hospital."

"This did not affect any people directly responsible for patient care."

The announcement was made Friday.

Those holding the eliminated jobs were laid off, Smitherman said.

"Of every position that was eliminated, not a single one was the result of job performance," Smitherman said. "It was as unfortunate as it could be that these people lost their jobs."

Smitherman said hospital administrators "recognized the inefficiency of the system," and decided to restructure so that more decision making responsibilities were given to department heads.

He emphasized that financial considerations were not a factor in the layoffs.

"The hospital is not in bad shape, the census is not falling," Smitherman said. "If anything, this will help us make patient care even better."

(Plaintiffs' evidentiary submission, Tab 16)